---

### DISSENT

---

DAVID A. NELSON, Circuit Judge, dissenting. I agree with the court's conclusion that there was no error in the determination that the affidavit was sufficient to establish probable cause for the search of the premises described in the warrant. As to this court's further conclusion that the defendant had a reasonable expectation of privacy in the basement of the duplex, however, it does not seem to me that the existence of such an expectation would render the search of the basement illegal. On the contrary, I believe that this hypothesis, if correct, would clearly establish the legality of the search under the express terms of the warrant.

The warrant, it will be recalled, directed the police to search both the downstairs apartment and the "curtilage." For Fourth Amendment purposes, courts "have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver v. United States*, 466 U.S. 170, 180 (1984). If the defendant in the case at bar reasonably expected that the basement of his dwelling unit would remain private, I am aware of no principled basis for excluding the basement from the curtilage.

As part of the curtilage, the basement was, to borrow a phrase from *United States v. Dunn*, 480 U.S. 294, 302 (1987), "an adjunct of the house" – and that is precisely how the police treated it. I think they were right to do so, and I would therefore affirm the judgment entered by the district court.

---

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0284P (6th Cir.)
File Name: 00a0284p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
　　*Plaintiff-Appellee,*

　　*v.*                                        No. 98-4046

KENNETH KING,
　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 95-00414—David D. Dowd, Jr., District Judge.

Argued: February 4, 2000

Decided and Filed: August 28, 2000

Before: NELSON, COLE, and CLAY, Circuit Judges.

---

### COUNSEL

**ARGUED:** James R. Willis, WILLIS, BLACKWELL & ROGERS, Cleveland, Ohio, for Appellant. David A. Sierleja, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** James R. Willis, WILLIS, BLACKWELL & ROGERS, Cleveland, Ohio, for Appellant. David A. Sierleja, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court. COLE, J. (pp. 37-39), delivered a separate concurring opinion. NELSON, J. (p. 40), delivered a separate dissenting opinion.

———————

**OPINION**

———————

CLAY, Circuit Judge. Defendant, Kenneth King, appeals from the judgment of conviction and sentence entered by the district court on June 18, 1998, pursuant to Defendant's conditional guilty plea to two counts of possession with intent to distribute crack cocaine within 1000 feet of a school yard in violation of 21 U.S.C. § 841(a) and § 860, wherein Defendant reserved the right to challenge the district court's denial of his motion to suppress the evidence. For the reasons set forth below, we **REVERSE** the district court's order denying Defendant's motion to suppress the evidence and **VACATE** Defendant's conviction and sentence.

### I. BACKGROUND

#### A. Procedural History

On November 20, 1995, a federal grand jury returned a three-count indictment charging Defendant and his brother, Kewin King, in Count 1 with possession with intent to distribute 443 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1). Kewin was named in Count 2 as having possessed 60.60 grams of cocaine base; and Defendant was charged in Count 3 as having possessed 16.65 grams of cocaine base, both in violation of 21 U.S.C. § 841(a)(1). Each of the counts carried a corresponding "schoolyard provision," in accordance with 21 U.S.C. § 860.

Prior to trial, both Defendant and Kewin filed various motions to suppress. Defendant's motion challenged the search warrant and its underlying affidavit, alleging that it was issued without probable cause. Kewin moved for separate trials. The district court conducted a hearing on the

For the foregoing reasons, I respectfully concur in the judgment reached by the court.

homes[1] expect that the common basements they share with other residents of their building are both secured from intrusions by strangers and reserved for access only by other residents, invited guests, and perhaps their landlord and her agents. Indeed, we have held this to be so in the case of a multi-unit apartment building: "A tenant expects other tenants and invited guests to enter in the common areas of the building, but he does not [expect] trespassers." *United States v. Carriger*, 541 F.2d 545, 551 (6th Cir. 1976). Thus, unlike Judge Clay, I do not find the instant case to be so far from the rule of *Carriger* that it requires a different analysis.

Further, I am convinced that no reasonable officer operating within the bounds of this court's jurisdiction would have been unaware that he needed a warrant describing with particularity the basement of a multi-unit building before he searched it. *See id.* at 552. Nor am I persuaded by the notion, proposed by the dissent, that the basement in a duplex is part of an individual unit's "curtilage." The cases raised by the dissent in support of this theory concern the relationship of free-standing homes to surrounding land, not that of individual apartment units to a common basement, which may or may not be "immediately adjacent" to a particular unit. *See Oliver v. United States*, 466 U.S. 170, 180 (1984); *see also United States v. Dunn*, 480 U.S. 294, 302 (describing curtilage in that case as "a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house.").

The government agents who searched King's apartment set out to search only one unit of a "three-story duplex or double-family home." If they wanted to search the structure's separate, common basement, they should have demonstrated probable cause and obtained a warrant specifically permitting them to do so.

---

[1]One of the FBI agents who executed the search of the King residence described the structure in which King dwelled as "a three-story duplex or double-family home."

motions, and thereafter denied the motions to suppress. The court granted the motion for separate trials, and ordered Defendant's trial to begin on January 22, 1996, and Kewin's trial to begin on February 6, 1996.

Thereafter, the district court *sua sponte* raised the issue of whether the search of the basement of the two-family dwelling where Defendant and Kewin resided – 1437 East 116th Street, Cleveland, Cuyahoga County, Ohio – exceeded the scope of the search warrant. The district court invited supplemental briefing on the issue, and Defendant and Kewin subsequently moved to suppress the 443 grams of cocaine base seized from the basement of the dwelling on the basis that the search of the basement exceeded the scope of the warrant. On January 18, 1996, without conducting an evidentiary hearing, the district court granted the motion to suppress the cocaine seized from the basement.

The government filed an interlocutory appeal to this Court on January 19, 1996, challenging the district court's order granting the motion to suppress the cocaine seized from the basement. The government also moved to stay or continue Defendant's trial pending review of the suppression order by this Court. The district court granted the continuance, and rescheduled Kewin's trial to begin on January 22, 1996, the date upon which Defendant's trial was originally set to begin. The government therefore filed an emergency motion to stay Kewin's trial with this Court, which was denied. On January 22, Kewin moved for a continuance, which the district court denied.

The case proceeded to trial as scheduled, and on January 23, 1996, the jury found Kewin guilty. The government sought to have the district court enhance Kewin's sentence pursuant to 21 U.S.C. § 841(a)(1)(A) based on his prior Ohio state court conviction for felony drug trafficking. The district court refused to enhance Kewin's sentence, however, because the government failed to comply with the notice provisions of 21 U.S.C. § 851(a). Kewin was

sentenced to 188 months of imprisonment to be followed by 5 years of supervised release.

Kewin appealed the denial of his motion for a continuance and raised an ineffective assistance of counsel claim. Kewin's appeal was consolidated with the government's appeal of the district court's suppression order and the court's refusal to enhance Kewin's sentence. Regarding the government's appeal of the suppression order, this Court held that the order be vacated, and remanded the issue to the district court for an evidentiary hearing because the record was inadequately developed for a proper review. *See United States v. King,* 127 F.3d 483, 486 (6th Cir. 1997). This Court also held that the district court did not abuse its discretion in denying Kewin's motion for a continuance; that the claim for ineffective assistance of counsel could not be considered based upon the inadequate record; and, in a matter of first impression, held that a clerical error in the information did not preclude the application of the § 851 enhancement because Kewin had sufficient notice despite the error, thereby reversing the district court's refusal to apply the enhancement to Kewin's sentence. *Id.*

Upon remand, the district court conducted a suppression hearing regarding the cocaine found in the basement. Thereafter, in an order dated May 27, 1998, the district court reversed its previous decision and denied Defendant's motion to suppress the evidence.

Kewin was resentenced to a term of 240 months of imprisonment, with credit given for time served, and to 5 years of supervised release. Kewin appealed the judgment to this Court, which is not at issue here. On June 11, 1998, Defendant entered conditional guilty pleas on Count 1 and Count 3 of the indictment, and was sentenced to a term of 168 months of imprisonment to be followed by 10 years of supervised release. It is from Defendant's guilty plea conviction and sentence that he now appeals.

_____

**CONCURRENCE**

_____

R. GUY COLE, JR., Circuit Judge, concurring. I agree with the court's conclusion that the district court did not err in determining that the affidavit in this case was sufficient to establish probable cause for the warrant to issue. *See supra,* Part II.A. Further, I concur with Judge Clay's conclusion that the government violated the Fourth Amendment when one of its agents searched the basement of the duplex in which Kenneth King resided. Because I would arrive at this conclusion by somewhat different means than does Judge Clay, I write separately.

The Supreme Court recently reiterated the nature of our inquiry when analyzing whether a government search violates the Fourth Amendment:

> Our Fourth Amendment analysis embraces two questions. First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he [sought] to preserve [something] as private. . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable.

*Bond v. United States*, 120 S. Ct. 1462, 1465 (2000) (internal citations and quotations omitted; brackets in original). There can be no real debate that King's conduct exhibited an actual expectation of privacy: he placed contraband inside a shoe box and hid it in the basement rafters of the duplex within which he dwelled. *See id.* If hiding something within a shoe box in the rafters of the basement of one's duplex or apartment building is not indicative of a person's attempt to keep something private, I am at a loss for what is. As for the question of whether society is prepared to recognize King's expectation of privacy as reasonable, I have no doubt that the countless individuals who live in duplexes or double-family

Accordingly, the district court erred in finding that the good faith exception to the Fourth Amendment exclusionary rule applied to save the illegal search.

### III.  CONCLUSION

For the above stated reasons, we hold that the district court erred in denying Defendant's motion to suppress the evidence.   Therefore, the district court's order denying Defendant's motion to suppress is **REVERSED**, and Defendant's judgment of conviction and sentence is **VACATED**.

### B.   Facts

The following recitation of facts is taken from this Court's prior decision in this case:

On October 31, 1995, members of the Federal Bureau of Investigation's Caribbean Gang Task Force obtained a warrant to search 1437 East 116th Street, Cleveland, Ohio, for drug paraphernalia, and weapons. The warrant authorized a search of the "premises, curtilage, containers, and persons therein" at a location described as "1437 East 116th Street, Cleveland, Cuyahoga County, Ohio, and being more fully described as the downstairs unit in a two-family, two and one half story, white wood [-]sided dwelling with green trim."

Although the record is sparse, it appears that the "downstairs unit" is a five-room apartment consisting of a front room, two bedrooms, a kitchen, and a bathroom. One bedroom and the kitchen are located in the rear of the apartment.  There is a door in the kitchen that leads to a common hallway.  The hallway contains a door that leads into the building's basement.  A person cannot directly access the basement from the downstairs unit. Defendants Kenneth and Kewin King lived in the downstairs unit.

On November 1, members of the Task Force executed the warrant.  As the agents entered the downstairs unit, they observed defendants standing near the kitchen. Kenneth ran to the second floor but was apprehended by one of the agents.  Both defendants were subsequently secured in the downstairs unit.

The officers searched the downstairs unit and found 60.6 grams of cocaine base in one bedroom and 16.65 grams in the other bedroom. One of the agents exited the downstairs unit and searched the building's basement where he discovered 443 grams of cocaine base.

*King,* 127 F.3d at 485.

At the suppression hearing held upon remand, the district court first determined whether Defendant and Kewin had standing to challenge the search of the basement of the dwelling in which the cocaine was found. The court noted that if it was determined that Defendant and Kewin had standing to challenge the search of the basement, the issue then became whether the agents exceeded the scope of the search, as authorized by the warrant, when they searched the basement. Carolyn King, mother of Defendant and Kewin who resided in the upper unit of the two-family flat, was called to testify in order to establish standing. Mrs. King testified that Defendant and Kewin lived on the first floor of the house; that she lived on the second floor with her two daughters and another son; and that her teenage son lived on the third floor. After considerable testimony by Mrs. King regarding the configuration of the dwelling and the living arrangements of the occupants, the district court concluded that Defendant and Kewin had standing to challenge the search.

The district court then considered arguments from defense counsels that the affidavit in support of the search warrant was constitutionally defective, and that the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984), did not apply. Testimony was also presented by the agents who conducted the search.

On May 27, 1998, the district court entered an order denying the motion to suppress the evidence. In its order, the court began by noting that although it was still of the belief "that the basement was not within the scope of the warrant," the court first had to decide whether Defendant and Kewin had "standing" to challenge the search, by determining whether Defendant and Kewin enjoyed a legitimate expectation of privacy "vis-a-vis the basement." (J.A. at 169.) The district court considered the testimony adduced at the suppression hearing and found that neither Defendant nor Kewin had a legitimate expectation of privacy in the basement. Accordingly, the district court held that "they have no 'standing' to challenge the search of the basement and the

authorize a search of the upstairs unit since it was a separate living unit. The agent claimed that in his experience as a Cleveland police officer, he never recalled a warrant which specifically mentioned the basement or the attic; that these areas were routinely searched because they were believed to be common areas of the living space; and that there is always an assumption that these areas are "common" areas subject to search. Based upon the agent's assertions, the district court concluded that "the officer who searched the basement had an objectively reasonable reliance that the search warrant for the 'downstairs unit' included the basement."

Although it is true that the warrant was not facially deficient as applied to Defendant's downstairs unit, it is also true that the warrant did not reference the basement area, and the agent was aware of the warrant's limitations. The agent's assertions that the basement was included in the common area of Defendant's downstairs unit of this two-family dwelling is not reasonable under these facts. Specifically, the basement of the duplex was not accessible to the general public -- i.e., the basement could not be reached from the outside because the door was locked and could only be entered if one of the tenants had admitted the guest into the duplex, and it was established law in this circuit at the time of the search that a tenant in an apartment building has a reasonable expectation of privacy in the common area of a building not open to the general public. *See Carriger*, 541 F.2d at 551; *see also* discussion *supra* Part II.B.1. The fact that the agent may have legally searched the basement of single family residences when the warrant did not specifically include the basement area is of no moment insofar as the single family residence cannot be compared to the two-family dwelling at hand. Which is to say, the agent's search of the basement in this type of situation is no different than if the agent had attempted to search the other unit without a warrant. *See United States v. Cato,* No. 94-5837, 1999 WL 742309, at **6-7 (6th Cir. Apr. 8, 1997) (finding that the good faith exception did not save the invalid search where the officers conducting the search were put on notice once they arrived at the scene that they may have been searching the wrong apartment).

a result of the illegal search should have been suppressed as poisonous fruits. *See Wong Sun,* 371 U.S. at 484-87.

## C.   Good Faith Exception

The district court held that even if the officer's search of the basement was found to be beyond the scope of the warrant, the illegal search would be saved nonetheless under the good faith exception to the exclusionary rule as espoused by the Supreme Court in *United States v. Leon,* 468 U.S. 897 (1984). A district court's determination as to whether the good faith exception of *Leon* applies to a search is reviewed by this Court *de novo. United States v. Durk,* 149 F.3d 464, 465 (6th Cir. 1998). Under the facts of this case, the district court erred in finding that the good faith exception applied.

In *Leon,* the Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to suppress evidence where the officer involved had an objective reasonable reliance on a search warrant issued by a neutral and detached magistrate or judge, even if the warrant is ultimately found to be invalid. 468 U.S. at 905. However, the Court found four specific scenarios where the good faith exception was inappropriate: (1) if the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate failed to act in a neutral and detached fashion and merely served as a rubber stamp for the police; (3) if the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or where the warrant application was supported by nothing more than a bare bones affidavit; and (4) if the warrant was facially deficient in that it failed to particularize the place to be searched or the things to be seized. *Id.* at 914-15, 923.

The agent who searched the basement acknowledged that the search warrant did not specifically mention the basement, and claimed that he did not know that the dwelling had a basement until he entered the hallway in the course of the search. The agent also acknowledged that the warrant did not

seizure of crack cocaine from the basement," despite the court's earlier ruling at the suppression hearing itself. (J.A. at 171-72.)

The district court then went on to state that "[s]ince this Court has concluded that the warrant did not include a search of the basement, and especially in the event a reviewing court were to find that the King brothers *did* have a legitimate expectation of privacy with respect to the basement, it is necessary to discuss the so-called '*Leon* exception.'" (J.A. at 172.) The district court concluded that "the officer who searched the basement had an objectively reasonable reliance that the search warrant for the 'downstairs unit' included the basement. Therefore, on that basis, the crack cocaine seized from the basement shall not be suppressed." (J.A. at 173 (footnote omitted)). Following the district court's ruling, Defendant entered a conditional guilty plea to Counts 1 and 3 of the indictment.

## II.   DISCUSSION

## A.   Sufficiency of the Affidavit

Defendant first argues that the district court erred in denying his motion to suppress the evidence on the basis that the affidavit submitted in support of the warrant was insufficient to establish probable cause for the warrant to issue because it lacked the requisite particularized facts regarding the alleged criminal activity and the premises to be searched. We disagree.

This Court reviews a district court's factual findings on a motion to suppress for clear error, and its conclusions of law *de novo. United States v. Leake,* 998 F.2d 1359, 1362 (6th Cir. 1993). When, as in this case, the district court is the reviewing court, we owe no particular deference to the district court's conclusions. *Id.*

When reviewing a state magistrate's determination of probable cause in reference to the issuance of a search warrant, this Court must determine whether, under a totality

of the circumstances, "the magistrate had a substantial basis for concluding that 'a search would uncover evidence of wrongdoing.'" *United States v. Sonagere,* 30 F.3d 51, 53 (6th Cir. 1994) (quoting *Illinois v. Gates,* 462 U.S. 213, 236 (1983)). This court pays "'great deference'" to a magistrate's findings, which "'should not be set aside unless arbitrarily exercised.'" *Leake,* 998 F.2d at 1363 (quoting *United States v. Pelham,* 801 F.2d 875, 877 (6th Cir. 1986) (citing *Gates,* 462 U.S. at 236)). Yet, "the magistrate [must] perform his 'neutral and detached' function and not serve merely as a rubber stamp for police." *Aguilar v. Texas,* 378 U.S. 108, 111 (1964). To that end, "[d]eference to the [issuing] magistrate . . . is not boundless." *United States v. Leon,* 468 U.S. 897, 914 (1984).

The Fourth Amendment guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. CONST. amend. IV. The warrant requirement serves to interpose between the police and an individual's personal privacy an orderly procedure involving "a neutral and detached magistrate[,]" *Johnson v. United States,* 333 U.S. 10, 14 (1948), who is responsible for making an "informed and deliberate determination" on the issue of probable cause. *Aguilar,* 378 U.S. at 110. The warrant process thus avoids allowing the determination of probable cause to rest with the "zealous" actions of the police who are "engaged in the often competitive enterprise of ferreting out crime." *Johnson,* 333 U.S. at 14.

Probable cause is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion," *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir. 1990), that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238. This determination does not lend itself to the application of "[r]igid legal rules," and no one decision may serve to provide a definitive basis upon which to rely inasmuch as "informant's tips, like all other clues and evidence . . . may vary greatly in the value and reliability." *Gates,* 462 U.S. at 232. Rather, the probable cause standard

that the search warrant authorized a search of the downstairs apartment as well as the curtilage; yet, the panel reversed the district court's order denying Defendant's motion to suppress the cocaine seized from the basement because the district court had failed to hold an evidentiary hearing. *See King,* 127 F.3d at 486. This Court found that remand was required for a determination by the district court as to whether the basement was part of the "downstairs unit" described in the warrant, and whether the good faith exception applied. *See id.* If it were an established principle that "curtilage" includes the basement of a dwelling such as this, then there would have been no need for the previous panel to have remanded the case. *See United States v. Black*, No. 98-5155, 1999 WL 357759, at **6 (6th Cir. May 11, 1999) (Wellford, J., concurring) (unpublished) (relying upon this Court's decision in *King*, 127 F.3d at 486, for the conclusion that remand was necessary to determine whether the officers search of the basement of a two-family dwelling exceeded the scope of the warrant which authorized a search of the downstairs unit and the curtilage). The previous panel as well as the district court could simply have concluded that the warrant expressly authorized a search of the basement because the warrant provided for a search of the curtilage of the downstairs apartment; however, neither court so held.

"Curtilage" is defined as as "[t]he land or yard adjoining a house, usu[ally] within an enclosure;" *see* BLACK'S LAW DICTIONARY 389 (7th ed. 1999), or "a yard, courtyard, or other piece of ground included within a fence surrounding a dwelling house[.]" *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 558 (3d ed. 1993). Therefore, under the legal and common definitions of curtilage, the dissent's conclusion that the basement area of this two-family dwelling is included in the curtilage is without basis. Moreover, under this Circuit's precedent, the basement area of this dwelling cannot be considered within its curtilage.

For all of the above stated reasons, we hold that the officer exceeded the scope of the warrant by searching the basement of the duplex, and that the 443 grams of cocaine recovered as

from the case at hand because Defendant's dwelling was not a multi-unit apartment building, but a two-family dwelling where, as stated in regards to the standing issue, Defendant as well as the other tenants enjoyed a reasonable expectation of privacy. As such, the area could not be considered "common" as in the case of a multi-unit apartment complex, and the officer should have sought a search warrant for the basement area when he came upon it during the course of the search of Defendant's unit; his decision to proceed without a warrant was flagrant and unreasonable under these facts. *See Garrison,* 480 U.S. at 87; *see also Brindley,* 192 F.3d at 531; *Lambert,* 771 F.2d at 93.

The government also contends that because Defendant and the other tenants (his mother and siblings) used the dwelling as one unit, the officer lawfully searched the basement inasmuch as a search warrant executed for a residence would have included the basement. We are not persuaded by Defendant's argument because the officer was not aware that the dwelling was being used in common by all of the tenants at the time of the search. To the contrary, the search warrant and affidavit in support thereof specifically identified Defendant's unit alone as the place where cocaine trafficking was occurring. (J.A. at 90, 92.) *See Florida v. J.L.,* ___ U.S. ___, 120 S. Ct. 1375, 1379 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."); *United States Garrison,* 480 U.S. at 81 (stating that the officers' actions should be judged based upon the information they had at the time of the search). Indeed, it was not until the suppression hearing upon remand from this Court that testimony from Defendant's mother established that the dwelling was used by all tenants as one. (J.A. at 170-72.)

The dissent argues that because the search warrant included the "curtilage" of the downstairs apartment in the area to be searched, the warrant thereby authorized a search of the basement. The dissent's characterization of curtilage in this respect is without precedent. Indeed, the panel which previously reviewed the suppression issue in this case knew

is a "'practical non-technical conception . . . [wherein] we deal with probabilities . . . [which are] the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at 231 (quoting *Brinegar v. United States,* 338 U.S. 160, 175-76 (1949)). Stated otherwise, "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. . . . Rigid legal rules are ill-suited to an area of such diversity. One simple rule will not cover every situation." *Id.* at 232 (citation and internal quotation marks omitted). As such, the issuing magistrate must apply a "totality of the circumstances" test to probable cause issues. *Id.* at 238. This test requires the magistrate to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying the hearsay information," probable cause exists. *Id.*

The Supreme Court identified factors which, although not to be analyzed as "separate and independent requirements to be rigidly exacted in every case," should be weighed by a reviewing court in assessing the value that should be afforded to an informant's tip when determining whether a substantial basis for probable cause exists. *See Gates,* 462 U.S. at 230-32. These factors, which consist of the "veracity" or "reliability" as well as "basis of knowledge" of the tip, are relative where the strength of one factor may compensate for the deficiency of another. *Id.* at 230, 238-39; *see United States v. Allen,* 211 F.3d 970, 982 (6th Cir. 2000) (*en banc*) (Clay, J., dissenting). However, "the information presented must be sufficient to allow the official to independently determine probable cause; 'his action cannot be a mere ratification of the bare conclusions of others.'" *United States v. Weaver,* 99 F.3d 1372, 1377 (6th Cir. 1996) (quoting *Gates,* 462 U.S. at 239). "In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of

affidavits on which warrants are issued." *Gates,* 462 U.S. at 239. With these standards and cautionary instructions from the Supreme Court in mind, we turn to the affidavit presented to the magistrate in this case to determine whether, under a totality of the circumstances, the affidavit was sufficient to establish probable cause for the warrant to issue.

The affidavit submitted to the court by Detective John Gannon of the Cleveland Police Department in support of the search warrant in question provided as follows:

> Before me, a Judge of the Court of Common Pleas, Cuyahoga County, Ohio, personally appeared the undersigned Det. John Gannon, #2452, who being first duly sworn, deposes and says that he is member of the Police Department of the City of Cleveland, in Cuyahoga County, Ohio, and that his training and experience include: twenty-six years experience with the Cleveland Police, with a current assignment to the Caribbean Gang Task Force; training in the recognition, production, and distribution of controlled substances; over one thousand arrests for drug-related offenses.

> Affiant has good cause to believe that on the premises known as 1437 East 116th Street, Cleveland, Cuyahoga County, Ohio, and being more fully described as the downstairs unit in a two family, two and one half story, white wood sided dwelling with green trim, the numbers "1439," the address for the upstairs unit, clearly visible on the south side of the entrance door to the upstairs unit, the structure being located on the east side of East 116th Street, facing west, and in the vehicle described as 1980's model gray Chevrolet Cavalier, Ohio Temporary License Number K591513, there is now being kept, concealed, and possessed the following evidence of criminal offense:

> Cocaine, and other narcotic drugs, and/or controlled substances; instruments and paraphernalia used in taking or preparing drugs for sale, use, or shipment; records of illegal transactions including computers

the limitations of the warrant, the issue in the case at hand becomes whether the officer's search of the basement was a flagrant disregard for the limitations of the warrant. *See Brindley v. Best,* 192 F.3d 525, 531 (6th Cir. 1999) (citing *United States v. Lambert,* 771 F.2d 83, 93 (6th Cir. 1985)). The test for making such a determination is whether the officer's actions were reasonable. *See Brindley,* 192 F.3d at 531.

In the case at hand, the officer's actions were not reasonable inasmuch as the area was not "common" area for purposes of being included within the parameters of the search of Defendant's unit, *see Carriger*, 541 F.2d at 551, *McCaster,* 193 F.3d at 934 (Heaney, J. concurring in part and dissenting in part), and the nature of the location of the basement in this two-unit dwelling should have put the agents on notice that the search warrant did not include this area. *See Garrison,* 480 U.S. at 87; *see also United States v. Heldt,* 668 F.2d 1238, 1262 (D.C. Cir. 1981) (noting that the authority to search under a valid warrant "is limited to the specific places described in it, and does not extend to additional or different places"). In *United States v. Evans,* this Court found that federal officers lawfully searched the basement area of a two-family duplex similar to that in the case at hand; however, unlike this case, the officers did so pursuant to a search warrant which *expressly included* the basement area in the scope of the search. *See* 320 F.2d 482, 483 n.1 (6th Cir. 1963) ("The specific portion of the building to be searched is the southern portion of the building, bearing the postal number 1000, including the basement and attic portion thereof.").

The government relies upon *United States v. Vaughan,* 875 F. Supp. 36 (D. Mass. 1995), in support of its contention that the warrant allowing for a search of Defendant's lower unit dwelling included a search of the basement. In *Vaughan,* the district court of Massachusetts held that a "search of a basement or attic connected to an apartment in a multiunit building is permissible under warrants limited to the apartment." *Id.* at 44. However, *Vaughn* is distinguishable

divided into more than one unit, probable cause must exist for each unit"); *United States v. Votteller,* 544 F.2d 1355 (6th Cir. 1976); *United States v. Baldacchino,* 762 F.2d 170, 177 (1st Cir. 1985).

In *Garrison,* the search warrant authorized the search of "premises known as 2036 Park Avenue third floor apartment." 480 U.S. at 80. The officers seeking the warrant believed that only one apartment existed on the third floor at the time that they applied for the warrant; however, the third floor was divided into two apartments. *Id.* After discovering contraband in Garrison's apartment on the third floor, the officers became aware that the floor was divided into two separate apartments. *Id.* Once the officers became aware of the separate apartments, they discontinued the search. *Id.* at 81. Garrison challenged the search warrant and the Court concluded that the warrant's validity should be determined "not in light of facts discovered upon execution of the search warrant, but rather in light of the information available to the officers at the time they acted." *Id.* (internal quotation marks omitted). The Court further concluded that the officers properly recognized that "they were required to discontinue the search of [the defendant's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.*

In the present case, the issue is not the validity of the warrant itself. Again, the search warrant issued for Defendant's downstairs unit of the two-family dwelling was valid in that it was supported by particularized facts to indicate probable cause that a search of the downstairs unit would uncover evidence of criminal cocaine trafficking. *See* discussion *supra* Part II.A.; *compare Votteller,* 544 F.2d at 1364 (finding the search warrant invalid because it failed to specifically address which unit in a four-unit apartment building, which included a basement apartment, was to be searched). However, because a valid search warrant can turn into an invalid general search if officers flagrantly disregard

and computer files, articles of personal property, and papers tending to establish the identity of the persons in control of the premises; other contraband, including, but not limited to, money, communications equipment, motor vehicles, and weapons being illegally possessed therein; and/or any and all evidence pertaining to the violations of the laws of the State of Ohio, to wit: R.C. 2923.24, 2925.03, and 2925.11, and 2925.13.

1.    Within the past twenty-four hours, affiant was contacted by another a confidential reliable informant concerning the delivery of a large quantity of crack cocaine to the above described premises.

2.    This information from confidential reliable informant (CRI) indicated that Kenneth King was trafficking in cocaine, and had crack cocaine at the above-described premises having been delivered to King by Antonio Cook within the past day.

3.    CRI is made reliable in that CRI has given information to the law enforcement official which has led to the arrest and/or conviction of more than seventy individuals for violations of state and/or federal drug laws, as well as the confiscation of more than $100,000.00 and 5 kilograms of controlled substances.

4.    CRI stated that King kept drugs at the above - described premises, giving a description of the premises, and King utilized the above described vehicle for the purpose of making deliveries of smaller amounts of crack cocaine. Investigation revealed that the above-described address is listed in the records of the Ohio Bureau of Motor Vehicles as an address for vehicles registered to Kenneth King.

5.    Affiant is also aware that Antonio Cook is a person known to members of the Task Force as a supplier of cocaine on the east side of Cleveland. Affiant also

determined that King has a prior felony conviction for GSI and Aggravated Assault and has done prison time.

6.   In the experience of affiant, narcotic drugs are frequently carried or concealed on people who are at locations where drugs are used, kept, or sold, and the size of useable quantities of drugs are small, making them easy to conceal on one's person.

7.   Further, in the experience of affiant, persons who traffic in illegal drugs frequently keep records of illegal transactions, at times using computers for such records, and evidence of communications used in the furtherance of drug trafficking activity, including, but not limited to, pagers, cellular telephones, answering machines, and answering machine tapes.

8.   Further, in the experience of the affiant, persons who traffic in illegal drugs frequently keep weapons, such as firearms, on or about their person or within their possession, for use against law enforcement officials, as well as other citizens.

9.   Permitting a motor vehicle to be used in the commission of a felony drug abuse offense is a violation of R.C. 2925.13.

10.   Affiant avers that it is urgently necessary that the above-mentioned premises be searched in the night season forthwith to prevent the above named property from being concealed or removed so as not to be found, and for the safety of the executing officers.

(J.A. at 92-94.)

Defendant argues that the affidavit was insufficient to establish probable cause insofar as it fails to provide any basis as to the reliability or veracity of the confidential informant, and fails to indicate that Detective Gannon conducted an independent investigation to corroborate the informant's allegations.   Defendant contends that Detective Gannon's

avers that he has reasonable cause to believe, and does believe, that on the premises known as 1437 East 116th Street, Cleveland, Cuyahoga County, Ohio, and being more fully described as the downstairs unit in a two family, two and one half story, white wood side dwelling with green trim, the numbers "1439," the address for the upstairs unit, clearly visible on the south side of the entrance door to the upstairs unit, the structure being located on the east side of East 116th Street,  facing west, and in the vehicle described as a 1980's model gray Chevrolet Cavalier, Ohio Temporary License Number K591513 . . . .

(J.A. at 90.)

"The fourth amendment requires warrants to particularly describe the place to be searched." *United States v. Blakeney,* 942 F.2d 1001, 1026 (6th Cir. 1991) (internal quotation marks and citation omitted); *see Maryland v. Garrison,* 480 U.S. 79, 84 (1987).   "The standard of review for this Court in determining whether a search warrant describes the place to be searched with sufficient particularity is a *de novo* review." *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989); *see United States v. Watkins,* 179 F.3d 489, 494 (6th Cir. 1999).

In *Gahagan*, this Court created a two-part test for determining whether a description in a warrant is sufficient to satisfy the particularity requirement: (1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched.   865 F.2d at 1496.   "For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses."   *See United States v. Shamaeizadeh,* 80 F.3d 1131, 1137 (6th Cir. 1996); *see also United States v. Gonzalez*, 697 F.2d 155, 156 (6th Cir. 1983) (noting that "[i]t is settled that where . . . a structure is

a duplex would have a reasonable expectation of privacy in an area shared only by the duplex's tenants and the landlord. Stated differently, the nature of the living arrangements of a duplex, as opposed to a multi-unit apartment building, affords the tenant of the duplex a greater expectation of privacy in areas the tenant of the multi-unit apartment building would not enjoy, because in the case of a duplex, access to such areas is limited to the duplex's tenants and landlord.

Accordingly, we find that Defendant enjoyed a reasonable expectation of privacy in the basement area of the two-family dwelling, where he shared the downstairs unit with his brother while his mother and siblings resided in the upstairs unit, and that this expectation is one which would be recognized by society. Thus, Defendant had standing to challenge the search of the basement.

### 2. Whether the Agents Improperly Exceeded the Scope of the Warrant when Searching the Basement

In its order denying Defendant's motion to suppress, the district court reaffirmed its previous conclusion "that the basement was not within the scope of the warrant;" however, the court went on to hold that despite this conclusion, Defendant did not have standing to challenge the search of the basement. The government argues that the warrant, which authorized a search of the first-floor unit, also authorized a search of the basement. We disagree with the government's contention, and agree with Defendant and the district court that the officer exceeded the scope of the warrant in searching the basement area.

The search warrant described the premises to be searched as follows:

Affiant has exhibited probable cause necessary to search the below listed premises, curtilage, containers, and persons therein upon the incorporated sworn affidavit, attached hereto as Exhibit A, wherein affiant

verification of Defendant's address, via the Ohio Department of Motor Vehicles, as being that alleged by the informant as a place where drugs were being trafficked, was inadequate to corroborate the informant's claims. Defendant further contends that because the affidavit does not aver that the confidential informant observed drugs or paraphernalia on the premises of Defendant's home, corroboration by Detective Gannon was particularly necessary. We disagree with Defendant's claims, and believe that the affidavit in support of the search warrant was sufficient to establish probable cause that illegal drugs could be found on the premises inasmuch as the affidavit described the area to be searched with particularity, was based upon information provided by a known reliable informant, and was verified by Detective Gannon to the extent possible.

The affidavit described Defendant's residence with particularity as being "the downstairs unit in a two family, two and one half story, white wood sided dwelling with green trim, the numbers '1439,' the address for the upstairs unit, clearly visible on the south side of the entrance door to the upstairs unit, the structure being located on the east side of East 116th Street, facing west." (J.A. at 92.) The affidavit further described Defendant's vehicle used in the distribution of cocaine with particularity as a "1980's model gray Chevrolet Cavalier, Ohio Temporary License Number K591513." (J.A. at 92.) The affidavit also indicated that in addition to describing the premises and the vehicle in such detail, the confidential reliable informant ("CRI") described the nature of alleged criminal activity in detail. (J.A. at 92.) For example, the CRI described the criminal activity as trafficking cocaine, and further stated that a large amount of cocaine had been delivered to the premises described in the affidavit twenty-four hours beforehand for the purposes of distribution. The CRI also stated that the large amount of cocaine had been delivered to the premises by Antonio Cook within the past day. (J.A. at 92-93.) The reliability of the informant was established in the affidavit by Detective Gannon's averments that the CRI had provided credible information in the past which had led to the arrest and/or

conviction of "more than seventy individuals for violations of state and/or federal drug laws, as well as the confiscation of more than $100,000.00 and 5 kilograms of controlled substances." (J.A. at 93.)

Moreover, the informant's tip was corroborated by Detective Gannon's own investigation *See Gates,* 462 U.S. at 244. For example, the affidavit indicates that Detective Gannon verified with the Ohio Department of Motor Vehicles that the vehicle described by the informant was registered to Defendant and that the address provided by the informant was Defendant's address. (J.A. at 93.) Detective Gannon also verified that Defendant had a prior history of criminal offenses for which he had spent time in prison. *Id.* Finally, Detective Gannon, as an experienced member of the task force established to ferret out drug-related crimes, averred that he was aware that Antonio Cook is a person known to members of the task force as a supplier of cocaine, which further supported the CRI's allegations. *Id.*

When considering the above information under a totality of the circumstances, we conclude that the affidavit provided a "substantial basis" for the magistrate to believe that "there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place;" namely, Defendant's residence. *See Gates,* 462 U.S. at 230-32, 238. Although the affidavit does not indicate that the CRI observed the delivery of a "large quantity of crack cocaine" to Defendant's residence firsthand, the affidavit does indicate that the CRI had provided accurate information in the past and that Antonio Cook, the individual alleged to have delivered the cocaine, was known to be a drug distributor. As a result, the lack of the firsthand observation is not fatal to the affidavit. *See id.* at 238-39 (noting that the strength of one factor may compensate for the inadequacy of another factor).

The affidavit in question is distinguishable from those cases where the affidavit was found to be insufficient to establish probable cause. For example, unlike in *Weaver,* where this Court held that the affidavit in support of the search warrant

including the washer and dryer. Furthermore, according to the testimony, the basement was not open to the public and Defendant had a right to exclude anyone who was not a tenant from the basement area, unless that person had been invited by one of the other tenants. Defendant was legitimately on the premises inasmuch as he paid rent to live in the lower unit, and he took normal precautions to maintain his privacy in the basement area insofar as the basement was not open to the public, the other tenants were family members, and there was an outside door to the basement which remained closed.

Furthermore, the fact that this was a two-family dwelling as opposed to a multi-unit apartment building inures to Defendant's benefit in that it is more likely that he enjoyed a reasonable expectation of privacy in the basement area – i.e., it is more likely that the basement area was not a "common" area for purposes of Fourth Amendment protection. *See McCaster,* 193 F.3d at 934 (Heaney, J. concurring in part and dissenting in part) (finding that "a tenant in a duplex has a reasonable expectation of privacy in common areas shared only by the duplex's tenants and the landlord"); *Holland,* 755 F.2d at 259 (Newman, J., dissenting) (finding that a tenant in a small two-family house enjoys a reasonable expectation of privacy in the vestibule of the dwelling); *Fixel,* 492 F.2d at 484 (holding that the backyard area of the defendant's four-unit apartment building was sufficiently removed and private in character such that a reasonable expectation of privacy could be found); *Killebrew,* 256 N.W.2d at 583 (holding that the common hallway shared solely by apartments, entry to which was limited by the occupants, was an area protected by Fourth Amendment guarantees); *Reddick,* 541 A.2d at 1214 (holding that the basement of a two-family duplex was an area in which society would recognize a reasonable expectation of privacy).

In addition, considering the fact that this Court has held that a tenant in an apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public, *see Carriger,* 541 F.2d at 551, it logically follows that a tenant in a small two-family dwelling such as

(J.A. at 170-72 (transcript citations and footnote omitted)). Without any analysis, the district court simply concluded that "[o]n these facts, this Court finds that neither Kewin King nor [Defendant] enjoyed a legitimate expectation of privacy with respect to the basement. Accordingly, they have no 'standing' to challenge the search of the basement and the seizure of crack cocaine from the basement." *Id.* We disagree with the district court's unsupported conclusion.[3]

As stated, the courts have considered a number of factors in identifying those expectations which qualify for Fourth Amendment protection. Although the most obvious among the factors is the person's proprietary or possessory interest in the place to be searched or item to be seized, a property right alone is not determinative of whether the individual reasonably expected "freedom from governmental intrusion." *Mancusi,* 392 U.S. at 368. Other factors include whether the defendant has the right to exclude others from the place in question; whether he has taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises. *See Cassity,* 720 F.2d at 456.

Defendant had a property or possessory right in the basement insofar as he was a tenant of the two-family dwelling and, as a result, was permitted to use the basement

---

[3] We note a contradiction in the district court's decision in this regard. Specifically, at the suppression hearing held on April 21, 1998, the district court heard considerable testimony from Defendant's mother regarding the configuration of the duplex and the relationship of the occupants thereof, and concluded that Defendant and Kewin had standing to challenge the search of the basement. (J.A. at 241.) However, in the district court's corresponding order to the suppression hearing, filed on May 27, 1998, the court made a contrary ruling – based upon the same testimony that Defendant's mother provided at the hearing – and held that "neither Kewin King nor Kenneth King enjoyed a legitimate expectation of privacy with respect to the basement. Accordingly, they have no 'standing' to challenge the search of the basement and the seizure of crack cocaine from the basement." (J.A. at 172.)

was insufficient to establish probable cause insofar as it presented no underlying factual circumstances to support the informant's knowledge, failed to indicate that the informant had provided information in the past, and failed to establish any independent police corroboration, the affidavit in the present case provides such detail. *See Weaver,* 99 F.3d at 1379. Similarly, in *Leake,* 998 F.2d at 1365, the affidavit was insufficient to establish probable cause in that the anonymous caller failed to provide the names of the individuals residing at the home where the marijuana was allegedly being grown, and failed to provide a date upon which the marijuana was allegedly seen; and the police failed to sufficiently corroborate the information. However, none of these insufficiencies are present here, even though the CRI did not observe the cocaine being delivered to Defendant's residence firsthand. *See United States v. Sonagere*, 30 F.3d 51, 53-54 (6th Cir. 1994) (finding that the fact that the informant had never provided the police with information in the past was not fatal, inasmuch as the other strengths of the affidavit, such as the detail with which the informant described the drug activity, along with the corroborative efforts of the affiant, provided a substantial basis upon which probable cause could be found).

We therefore hold that the district court did not err in denying Defendant's motion to suppress the evidence, where the affidavit submitted in support of the warrant was rich in detail, was based upon a tip from a known and reliable informant, and was corroborated by independent police investigation.

## B.   Scope of the Warrant

Defendant next argues that even if the warrant was validly issued, the 443 grams of cocaine seized from the basement of the dwelling should have been suppressed because the officer exceeded the scope of the warrant in searching the basement area. Defendant contends that the district court erroneously found that Defendant did not have standing to challenge the scope of the warrant on the basis that neither he nor Kewin enjoyed a legitimate expectation of privacy in the basement

area.   We agree with Defendant's contention that he had standing to challenge whether the scope of the warrant included the basement area, and we also agree with Defendant that the officer exceeded the scope of the warrant in searching the basement area.

### 1.   Whether Defendant had a Legitimate Expectation of Privacy in the Basement Area of the Two-Family Dwelling[1]

Because Fourth Amendment rights are "personal," *see Rakas v. Illinois,* 439 U.S. 128, 140 (1978), the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized. *Katz v. United States,* 389 U.S. 347, 353 (1967); *see Minnesota v. Olson,* 495 U.S. 91, 96-97 (1990); *United States v. Kincaide,* 145 F.3d 771, 779 (6th Cir. 1998).   A determination of whether a legitimate expectation of privacy exists involves a two-part inquiry.  "First, we ask whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private. . . .   Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *See Bond v. United States,* ___ U.S. ___, 120 S. Ct. 1462, 1465 (2000) (citation, internal quotation marks, and alterations omitted). Whether a legitimate expectation of privacy exists in a particular place or item is a determination to be made on a case-by-case basis. *See United States v. Brown,* 635 F.2d 1207, 1211 (6th Cir. 1980).

---

[1] The question of whether a defendant has "standing" to challenge an allegedly illegal search collapses into the substantive issue of whether the defendant had a legitimate expectation of privacy. *See United States v. Maddox,* 944 F.2d 1223, 1224 (6th Cir. 1991).  If there is no legitimate expectation of privacy, "it adds nothing to say that the defendant had 'no standing.'" *Id.*

court's accurate description, it reached the wrong conclusion as to whether Defendant enjoyed a reasonable expectation of privacy in the basement under these facts.  Specifically, the district court described the basement area in the duplex and its manner of use as follows:

> The house contained a basement, which was one big unpartitioned area, with three unlocked storage rooms. Everyone residing in the house was permitted to use the basement.  Mrs. King [Defendant's mother] owned the washer and dryer which were in the basement, but everyone in the house used them, including Kewin and [Defendant].  Mrs. King denied that the basement was "open to the public."  She described it as "open to who lived in the house."  Anyone in the basement would had to have been invited in by a tenant.

> The basement could be reached in one of two ways, either through the "back" door off a small porch on the side of the house or via a common hallway in the interior of the house.  A door from the kitchen of the first floor unit opened into this common hallway, as did doors from the second and third floor.  The basement was not locked.

> Mrs. King acknowledged that although there were two living units, they all lived there as one family.  She had keys to everything in the house and access to everything. Kewin and [Defendant] also had access to the whole house, however Mrs. King testified that they usually stayed pretty much in the first floor unit.  Everyone in the house had "free rein" to the whole house "from the basement to the third floor."

> On the day that the search warrant was executed, the door from the common hallway to "back" porch was closed, but all of the doors into the living units were open.  An agent who was part of the entry team did not recall there being a door on the entrance to the basement and he was certain that no one had to actually open a door to get into the basement.

In a case on point to that of the instant case, the Supreme Court of Connecticut held that the defendant's subjective expectation of privacy in the common basement of a two-family house was reasonable and was an expectation that society would also recognize as such. *See Connecticut v. Reddick,* 541 A.2d 1209, 1214 (Conn. 1988). The court therefore concluded that "because the search that disclosed the shotgun [which was found hidden in a washing machine in the basement] was not authorized by a warrant, the fruit of that search, the shotgun, should have been suppressed at the defendant's trial." *Id.* (citing *Wong Sun v. United States,* 371 U.S. 471, 484-87 (1963)). In so holding, the court noted the distinction between the two-family dwelling involved and multi-unit apartment buildings when it stated that "[p]olice observations in the common areas of multiple family dwellings do not constitute a search under the fourth amendment if the circumstances indicate that the area is readily accessible to outsiders. The contrary is true, however, if the area is sufficiently secured so as to give the tenants a justified expectation of privacy." *Id.* (citations omitted).

Against this backdrop, we will now determine whether Defendant had a reasonable expectation of privacy in the basement of the two-family duplex where he resided. Pursuant to *Katz,* before a place can be labeled "private" or "public" for purposes of determining the reasonableness of a person's expectation of privacy, it is necessary to consider both the nature of the place and the manner in which the person is using it. *Katz,* 389 U.S. at 351. As the oft quoted phrase goes, "the Fourth Amendment protects people, not places." *Id.* Therefore, in conducting the relevant analysis here, it is necessary to consider the unique nature of the two-family dwelling and the basement located therein, as well as the circumstances under which Defendant was using the basement.

Here, Defendant agrees that the district court accurately described the basement area in the duplex and the manner in which it was used by Defendant and the other tenants. However, Defendant contends that the despite the district

"Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas,* 439 U.S. at 143 n.12. The courts have considered a number of factors in identifying those expectations which qualify for Fourth Amendment protection. Although the most obvious among the factors is the person's proprietary or possessory interest in the place to be searched or item to be seized, a property right alone is not determinative of whether the individual reasonably expected "freedom from governmental intrusion." *Mancusi v. DeForte,* 392 U.S. 364, 368 (1968). Other factors include whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises. *See United States v. Cassity,* 720 F.2d 451, 456 (6th Cir. 1983), *vacated and remanded on other grounds,* 468 U.S. 1212 (1984), *rev'd on other grounds,* 604 F. Supp. 1566 (E.D. Mich. 1985), *aff'd,* 807 F.2d 509 (1986); *see also Rawlings v. Kentucky,* 448 U.S. 98, 105 (1980); *United States v. Haydel,* 649 F.2d 1152 (5th Cir. 1981).

In this case, Defendant exhibited an actual subjective expectation of privacy in the basement by hiding the cocaine there. *See Bond,* 120 S. Ct. at 1465 (finding that the defendant sought to preserve his privacy by placing the brick of cocaine in an opaque bag and placing it directly above his seat on the bus in which he was a passenger); *United States v. Bailey,* 628 F.2d 938, 943-44 (6th Cir. 1980) (finding that the defendants exhibited an expectation of privacy in a drum of chemicals by hiding it in a locked storage compartment of the basement of an apartment); *United States v. Taborda,* 635 F.2d 131, 137 (2d Cir. 1980). As such, the salient question becomes whether Defendant's subjective expectation of privacy in the basement area of a two-family house is an expectation that society would recognize as reasonable under these facts. *See Bond,* 120 S. Ct. at 1465; *Katz,* 389 U.S. at

361; *Brown,* 653 F.2d at 1211 (noting that a determination of whether a legitimate expectation exists is to be made on a case-by-case basis).

Although this Court has recognized that a tenant in an apartment building has a reasonable expectation of privacy in the common area of the building not open to the general public, *see United States v. Carriger,* 541 F.2d 545, 551 (6th Cir. 1976), the Court has not expressly considered the narrow issue presented today. Which is to say, the Court has yet to consider whether a two-family dwelling should be treated differently for purposes of Fourth Amendment protection such that an area which would not be entitled to Fourth Amendment protection in an apartment building would be entitled to Fourth Amendment protection for purposes of a two-family dwelling such as a duplex. Moreover, the Court has yet to specifically consider whether the basement of such a dwelling is entitled to Fourth Amendment protection. The courts which have considered the issue are split as to the outcome, thereby rendering more uncertain the determination of whether "society" would find a legitimate expectation of privacy in the basement area of the dwelling in this case.

For example, the United States Court of Appeals for the Eighth Circuit held that the tenants of a two-story building which contained four apartment units (two on each floor) and a basement, did not enjoy a reasonable expectation of privacy in the basement area. *See United States v. McGrane,* 746 F.2d 632, 634 (8th Cir. 1984). The Court likened the basement area of the dwelling to a common hallway of an apartment building – which is used by residents and their guests, the landlord and his agents, and others having legitimate reasons to be on the premises – and therefore concluded that "the basement of 19 Brighton Way constituted a common area of the building, accessible to all tenants and the landlord. Accordingly, McGrane did not have an expectation of privacy extending into the basement and the visual inspection of a storage locker in this area did not violate the fourth amendment." *Id.* (citing *United States v.*

common hallway, and there is no indication that he ever tried to do so." *Id.* (citations omitted).

However, the dissent disagreed with the majority's conclusion based upon the unique nature of the limited size of the dwelling. *See Holland,* 755 F.2d at 259 (Newman, J., dissenting). Specifically, Judge Newman opined that "I have no doubt that a tenant in a multi-apartment building must accept the risk that someone else will admit a police officer into the common areas of the building and, if the defendant is present in those areas, he may be arrested there upon probable cause. But following *Katz* (temporally and substantively), I believe a tenant has a legitimate expectation of privacy in a hallway when he is using it to admit someone to his home; at least, this should be so in a small two-family house like Holland's." *Id.*

State courts as well have considered the unique nature of small limited family dwellings as opposed to large multi-unit apartment buildings for purposes of Fourth Amendment jurisprudence. For example, in *People v. Killebrew,* 256 N. W. 2d 581, 583 (Mich. Ct. App. 1977), the Michigan Court of Appeals held that the defendant's motion to suppress was properly granted because

the warrantless search and seizure was not justified by the plain view exception as the police officers were not rightfully in the hallway when they spotted the evidence. Generally, a hallway shared by tenants in a private multi-unit dwelling is not a public place. It is a private space intended for the use of the occupants and their guests, and an area in which the occupants have a reasonable expectation of privacy. *In the case at bar there were only two apartments sharing a common hallway, entry to which was limited by right to the occupants. These occupants certainly could expect that a high degree of privacy would be enjoyed in that area.*

*Id.* at 217-18 (emphasis added).

backyard an area open as a corridor to a salesman or other businessmen who might approach the tenants in the course of their trade. This apartment was [the defendant's] home, he lived there and the backyard of the building was completely removed from the street and surrounded by a chain link fence. While the enjoyment of his backyard is not as exclusive as the backyard of a purely private residence, this area is not as public or shared as the corridors, yards or other common areas of a large apartment complex or motel. *Contemporary concepts of living such as multi-unit dwellings must not dilute [the defendant's] right to privacy any more than is absolutely required. We believe that the backyard area of [the defendant's] home is sufficiently removed and private in character that he could reasonably expect privacy.* Thus . . . actual invasion into this protected area and search [thereof] violates the Fourth Amendment.

*Id.* (citations and footnote omitted; emphasis added).

The distinction between a dwelling occupied by a limited number of tenants, such as a small two-family house, and a large multi-unit apartment building for purposes of Fourth Amendment guarantees was also noted by the United States Court of Appeals for the Second Circuit. *See United States v. Holland,* 755 F.2d 253, 259 (2d Cir. 1985) (Newman, J., dissenting). In *Holland*, the two-judge majority reversed the district court's order granting the defendant's motion to suppress evidence seized incident to the defendant's warrantless arrest. *Id.* at 257. The court did so on the basis that the defendant did not enjoy a reasonable expectation of privacy in the vestibule of the two-story dwelling where the defendant resided in the second floor apartment. *Id.* at 256. The court reasoned that "[i]n passing along the common ways in his building on any given day, including the day of his arrest, appellee reasonably might expect to meet the landlord or his agents, the occupants of the first floor apartment, deliverymen, tradesmen, or one or more visitors to the first floor apartment. He had no right to exclude them from the

*Eisler,* 567 F.2d 814 (8th Cir. 1977); *United States v. Luschen,* 614 F.2d 1164, 1173 (8th Cir. 1980)).

About fifteen years later, the Eighth Circuit had occasion to consider whether a defendant had a legitimate expectation of privacy in a hall closet located within a common area of a duplex in which he resided. *See United States v. McCaster,* 193 F.3d 930, 931-32 (8th Cir. 1999). Relying upon its earlier decision in *McGrane*, the two-judge majority concluded that the defendant did not enjoy a legitimate expectation of privacy in the hall closet because he failed to show any efforts to exclude others from the space because the landlord and two other tenants had access to the closet. *Id.* at 933. However, in a partial concurrence/dissent, one of the panel members specifically noted that the dwelling in question was a duplex and opined that, "[i]n [his] view, a tenant in a duplex has a reasonable expectation of privacy in common areas shared only by the duplex's tenants and the landlord." *Id.* at 934 (Heaney, J. concurring in part and dissenting in part). Judge Heaney went on to distinguish the three other cases from the Eighth Circuit which held that "a tenant does not have a reasonable expectation of privacy in the common areas of an apartment building;" namely, *United States v. McGrane,* 746 F.2d 632 (8th Cir. 1984); *United States v. Luschen,* 614 F.2d 1164 (8th Cir. 1980); and *United States v. Eisler,* 567 F.2d 814 (8th Cir. 1977). *Id.* Judge Heaney opined as follows:

These cases are distinguishable from the facts of this case. First, McCaster lived in a duplex, where only he and the upstairs tenants resided. *Eisler, McGrane,* and *Luschen* involved multiple-unit apartment buildings with more than two tenants. Hence fewer individuals had access to the common area in this case than in our prior cases.

Second, the common area in this case was a closet shared by McCaster, the upstairs tenants, and the landlady. Unlike a hallway or basement, the closet was isolated. It was located under the stairs that led to the

upstairs apartment and was used as a storage area for the tenants and the landlady. As a storage area, the closet likely would not be accessed by anyone other than the tenants and landlady and would certainly not be accessed as frequently as a hallway or basement. Thus, accessibility to the closet was more limited than the hallways or basement addressed in our prior cases.

Third, the facts of this case are similar to *United States v. Fluker,* 543 F.2d 709 (9th Cir. 1976), a case we distinguished in *Eisler*. In *Fluker,* the court held that the defendant had a reasonable expectation of privacy in the corridor separating the door of his apartment from the outer doorway of the apartment building. The court noted that the defendant lived in a building with only two other tenants and that access to the entryway was limited as a matter of right to the two basement tenants. Furthermore, the outer door was always locked, with only the building's three tenants having keys. Based on these facts, the court found that the two basement tenants exercised "considerably more control over access to that portion of the building than would be true in a multi-unit complex, and hence could reasonably be said to have a greater reasonable expectation of privacy than would be true of occupants of large buildings."

Similar to the defendant in *Fluker*, McCaster's building consisted of only two units. Both the front and back doors of the duplex had locks, and only the tenants and the landlady had access to the duplex. Further, the closet was shared only by the tenants and the landlady. Thus, because the right to access to the duplex and use of the closet was limited to these individuals, McCaster could reasonably have expected greater privacy than if he resided in a multiple-unit building.

*The nature of the living arrangement in a duplex, as opposed to a multi-unit building, leads me to conclude that a tenant in a duplex has a reasonable expectation of*

*privacy in common areas shared only by the duplex's tenants and the landlady*.

*McCaster,* 193 F.3d at 934-35 (Heaney, J. concurring in part and dissenting in part) (citations omitted; emphasis added).[2]

In a similar vein, the United States Court of Appeals for the Fifth Circuit considered the fact that the defendant's dwelling, a four-unit apartment building, was distinct from a large apartment complex or motel such that the defendant enjoyed a legitimate interest of privacy in the backyard of the dwelling. *See Fixel v. Wainwright,* 492 F.2d 480, 484 (5th Cir. 1974). In *Fixel,* the government argued as follows:

[E]ven assuming that this dwelling is [the defendant's] home and that Fourth Amendment protections are normally afforded such places, the multi-unit character of this residence results in a relinquishment of any right of privacy relating to the backyard. Because it is located in a four-unit apartment building, the government contends that [the defendant's] home should not be entitled to the protection usually afforded the curtilage of a purely private residence. Like a motel or large apartment complex, this backyard is an area common to or shared with other tenants, is open to the neighbors in the adjacent building and thus not within the guarantees of the Fourth Amendment.

*Id.* (citations omitted). The Fifth Circuit rejected the government's argument and held that

[t]he backyard of [the defendant's] home was not a common passageway normally used by the building's tenants for gaining access to the apartments. Nor is the

---

[2]The Court of Appeals for the Ninth Circuit cited this Court's decision in *Carriger* for the proposition that "a tenant in an apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public." *See Fluker,* 543 F.2d 709, 716 n.2 (9th Cir. 1976) (citing *Carriger,* 541 F.2d 545)).