**File Name: 04a0113n.06**
**Filed: November 19, 2004**
NOT RECOMMENDED FOR PUBLICATION

**Nos. 01-2395, 01-2398, 01-2664, 02-1450**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| MARCUS A. ROBINSON, | ) | |
| DENNIS K. MILES, | ) | O P I N I O N |
| CHAD J. ROBINSON, | ) | |
| FRANCIS D. HAYDEN, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: BATCHELDER and DAUGHTREY, Circuit Judges; and DOWD, Senior District Judge.[*]

DOWD, J.

## I. Introduction

The four defendant- appellants, Marcus Robinson, Chad Robinson, Dennis Miles and Francis Hayden, were convicted in a month-long jury trial that featured a charge of conspiracy involving the growing and harvesting of marijuana plants in the states of Indiana and Michigan over a lengthy period of time. Two of the defendants, Chad Robinson and Francis Hayden, received life sentences;

---

[*] The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

Marcus Robinson was sentenced to a term of 130 months and Dennis Miles was sentenced to a term of 121 months.

## II.  Summary of the Factual Background

Count 1 in the third superceding indictment charges a marijuana conspiracy in violation of 18 U.S.C. § 846, covering the years 1991 until 1998, in the Eastern District of Michigan and *elsewhere*.  The government's evidence demonstrated that the growing of marijuana for sale began in the State of Indiana and expanded into the State of Michigan in 1995.

The testimony presented by the government was broken into four separate phases.

The first phase dealt with the Indiana operation and featured the testimony of defendant-appellant Chad Robinson's former wife, Frances Robinson, and the additional testimony of James Steffen.  Frances Robinson indicated that her ex-husband, Chad Robinson, and his brother operated a farm in Indiana for the growing of marijuana and utilized their used-car operation at R Motors as a cover for the sale of marijuana.  Her testimony was supported by James Steffen who described his many purchases of marijuana from co-conspirator Ralph Kough.  Steffen also provided testimony that connected the Robinson brothers, Chad and Marcus, to the Indiana operation.

The second phase of testimony began with the 1995 purchase of a 78-acre farm on Argyle Road in Sanilac County in the State of Michigan by the Robinson brothers, Chad and Marcus. The farm was used in the summer of 1995 for the growing and harvesting of massive amounts of

marijuana, hidden in rows of corn. Co-defendant James Austin Mattingly, a government witness, described the 1995 operation in great detail.[1]

The third phase of testimony involved a similar marijuana-growing operation in the summer of 1996, supervised by the defendant Francis Hayden.

The fourth phase involved the inadvertent discovery of the marijuana operation on the Sanilac County farm in the latter part of August 1996 and the subsequent lengthy investigation that led to the initial indictment returned on February 10, 1999. On October 31, 1996, James Knowlton, a neighbor of the Argyle Road farm, called the local Sheriff's office and reported that he noticed unattended horses had escaped from their pasture on the Argyle Road farm and were on the road. Knowlton also asked the officers to check on the welfare of Hayden, the horses' owner, since no one had seen Hayden for days. J.A. 1256-1258; 2263-2267.

Deputy Ed Jarosz went to the Argyle Road farm in response to Knowlton's request. He found no one at the farm, but did see marijuana in the trailer on the property; he secured the premises while a fellow officer obtained a search warrant. J.A. 1257-64. Upon executing the search warrant, the officers discovered the sophisticated marijuana-processing facility which had been built in the barn, as well as records that listed the number of marijuana plants that had been planted in each row of corn. The total of over 18,900 plants that the record suggested was consistent with the marijuana stalks that were found in the corn the officers discovered still standing, unharvested. J.A. 1281-1286; 1319-1323; 1333-1335. The officers also discovered a horse trailer in the barn. They

---

[1] James Austin Mattingly had a brother named James Curtis Mattingly. To differentiate between the brothers, the parties used the middle names, Austin and Curtis. Curtis testified as a defense witness called by the defendant Francis Hayden. See J.A. 3209-3274. Curtis admitted working in both the 1995 and 1996 growing and harvesting operations, but denied knowing Francis Hayden.

3

traced the trailer to Hayden using the confidential VIN number. J.A. 1294; 1325-1329. The officers also found fingerprints for Hayden and James Curtis Mattingly on the farm. J.A. 2345-2348; 2419-2420; 2527-2532; 3216-3219; 3240; 3246-3248.

Sheriff's deputies called Marcus Robinson, who was listed as owner of the Argyle Road farm, in an attempt to locate the responsible parties. Marcus Robinson claimed that he had rented the property to John Hunt. J.A. 853; 872; 1745-48; 1753-55. Subsequent investigations revealed that "John Hunt" was a pseudonym that several members of the conspiracy used, and that the purported lease between Marcus and John Hunt was a fake. *See, e.g.*, J.A. 1546-51; 1751-53; 2077; 2085; 2130; 2669-70.

Sergeant Biniecki made undercover calls to R Motors trying to find more information about the owner of the horses, then known as "Frank." Biniecki spoke with Chad Robinson, who claimed to know little about the property and falsely said he had never been there. J.A. 848-52; 1729-31. In fact, Chad had posed as Marcus Robinson in January 1995 when the agreement for the purchase of the Argyle Road farm was signed, allegedly because Marcus was ill. J.A. 1375-97; 1488-1501, 1506-1508; 1521-1523.

First, second and third superceding indictments were returned. The third superceding indictment was filed on March 28, 2001.[2]

---

[2] The first indictment was filed on February 10, 1999; in the first count, charging a 21 U.S.C. § 846 conspiracy, it named defendants Marcus Robinson, Chad Robinson, Rex Robinson, Ralph Michael Kough, Barbara L. Kough, Francis Darrell Hayden and James Austin Mattingly. The first superceding indictment filed on December 7, 1999 added two new defendants, Dennis Keith Miles and James Michael Everett. The second superceding indictment filed on August 16, 2000 named all nine defendants included in the first superceding indictment. The third superceding indictment filed on March 28, 2001, reduced the number of defendants charged in the conspiracy to the three Robinsons (Marcus, Chad and Rex) along with Francis Hayden, Dennis Miles and James Everett. The trial in the case under appellate review involved the three Robinsons, Hayden and Miles. The record before us does not disclose the outcome

(continued...)

### III.   The Primary Issues on Appeal

**A.     The Testimony of Chad Robinson's Ex-Wife, Frances Robinson**[3]

The third superceding indictment charged Chad Robinson with a conspiracy that began in 1991 and continued until 1998 in Michigan and *elsewhere*.  Chad Robinson lived in Indiana with his ex-wife, Frances.  She filed for divorce in 1994 and was divorced in 1995.  Subsequently she was questioned and cooperated; she testified before the grand jury and her testimony was apparently made available.  Her testimony, beginning at J.A. 1940, covered 127 pages of the transcript and clearly implicated Chad and his brother Marcus in a marijuana operation in Indiana.  Her testimony described the used car business at R Motors in Indiana as a cover for a vast marijuana operation in Indiana which included nurturing marijuana seeds to plants, placing  the plants in corn fields at night,  and a night-time "coon hunting ruse" used by Chad and Marcus to cover their marijuana-growing  work in the corn fields.  Frances also testified to accepting money for what appeared to be obvious payments for marijuana even though the payments were delivered to the R Motors office which was near their home in Indiana.  However, Frances was not involved in the subsequent 1995-1996 marijuana-growing operation in Michigan.

---

[2](...continued)
of the case against Rex Robinson, but only against Marcus and Chad Robinson.  The charges against the two Koughs, James Everett and James Austin Mattingly were resolved earlier by guilty pleas.  Only Mattingly testifed as a government witness and his testimony focused on the marijuana operation on the Michigan farm in 1995.

[3] Chad Robinson raises a number of issues on appeal.  One of the claims alleges insufficient evidence to support his conviction.  Our review of the record leads to the conclusion that the insufficient evidence claim is patently without merit.  Chad Robinson does not challenge his sentence.  He does allege four specific claims of prosecutorial misconduct, which include the questioning of his ex-wife, Frances Robinson, and which we address in depth, and also misconduct during the final argument, which we address later in this opinion.

Case No. 01-2395/2398/2664/02-1450

The issue of the spousal objection to communications during the marriage was raised for the first time when the government called Frances as a witness. The district court recessed, studied the relevant law, and opined as follows:

> THE COURT: Be seated, please. I have reviewed the Sims case.[4] It is clear that there are two marital privileges that apply in certain circumstances. One is a privilege against marital facts which applies in a situation where the witness and the testifying spouse are currently married. It certainly does not apply here because I understand the witness, Frances Robinson, is a former wife of defendant Chad Robinson.
>
> And in all events, that particular privilege is the privilege of a testifying spouse and can be waived by that spouse, which was the decision of the Supreme Court in the Trammel case 21 years ago.[5]
>
> The privilege that apparently applies here, and may be asserted by the defendant, is the privilege against disclosure of confidential marital communications. And that privilege applies when a communication occurred during the course of a marriage and was intended to be confidential, that is it was made in the presence of the husband and wife only and not the presence of third parties. That privilege survives the dissolution of the marriage and may be invoked by the non-testifying spouse.
>
> The government has cited an exception to that privilege, which applies in the sixth circuit, in a case in which the testifying spouse has engaged in communication with the non-testifying spouse, or the defendant, in patently illegal criminal activity. The sixth circuit has recognized the exception to that privilege but it's limited. The court held in Sims that the exception would be adopted in the sixth circuit. It stated that the exception is limited to permit admission only of those conversations that pertain to patently illegal activity. Only where spouses engage in conversations regarding joint ongoing or future patently illegal activity does the public's interest in discovering the truth about criminal activity outweigh the public interest in protecting the privacy of the marriage.
>
> * * *

---

[4] The *Sims* case to which the District Court referred is *Sims v. United States*, 755 F.2d 1239 (6th Cir.), *cert. denied*, 473 U.S. 907 (1985).

[5] The *Trammel* case to which the District Court referred is *Trammel v. United States*, 445 U.S. 40 (1980).

6

On the other hand, conduct sought by one spouse that is unambiguously illegal would seem outside the area of a desired husband wife intimacy, so that the admission of related communications would be unlikely to hinder favored discussion.

\* \* \*

If the communications took place while the marriage was in effect, then before the testimony can be admitted, a foundation must be established that the communications involved patently illegal activity by both the witness and the defendant; that is joint activity.

J.A. 1906-07; 1907; 1908 (footnotes added). After the district court carefully spelled out the ground rules, he announced the requirement that, absent an objection, the privilege is waived.[6]

In sum, the district court relied on the teachings of *Sims v. United States*, 755 F.2d 1239, 1243 (6th Cir. 1985), and spelled out two exceptions that would result in a denial of the spousal privilege; *i.e.,* conversations that relate to patently illegal activity or conversations in the presence of a third person.

The testimony of Frances Robinson, if believed by the jury, was devastating to the Robinson brothers. However, on five occasions, it developed that the testimony of Frances Robinson infringed on the spousal privilege; timely objections were raised, the objections were sustained and the jury instructed to disregard the answers.[7]

---

[6] THE COURT: Now, also, Mr. Scales, I'm sure you understand the privilege must be asserted or it's waived. So timely objection will be required, do you understand that? J.A. 1909.

[7] The five occasions are found at: (1) J.A. 1932 line 19 to 1935 line 18; (2) J.A. 1941 line 9 to 1942 line 25; (3) J.A. 1944 line 13 to 1945 line 15; (4) J.A. 1977 line 1 to 1978 line 9; and (5) J.A. 1982 line 3 to 1983 line 2.

The first objection was carefully handled by the district court in the following extensive colloquy:

Q [Ms. Parker]. In 1992 did you – this a yes or no question – in 1992 did you have reason to believe that marijuana was being grown anywhere other than the farm in Selvin?
A. In '92?

(continued...)

---

[7](...continued)

Q.    Yes.

A.    No.

Q.    In the fall of 1992 was there a harvest of marijuana?

A.    I'm sure there was.

Q.    Why do you answer in that fashion, did you see it?

A.    No.

Q.    Why did you think there was?

MR. SCALES: Foundation, your Honor.

THE COURT: I think that's what she's getting at is a foundation.

A.    Because I knew that they had planted the plants in Selvin in the bedroom.

Q.    Let me ask it this way, did you hear any discussion – first of all, how did you know that the plants were planted in the bedroom in Selvin?

A.    In Selvin?

Q.    Yes, in '92.

A.    We went up there once in the latter part of the winter, early spring.

Q.    Who is we?

A.    Chad, Sadie, Russell and I.

Q.    All right. And what did you see?

A.    At that time?

Q.    Yes.

A.    I didn't see the plants but I knew they were there.

Q.    How did you know that?

A.    Because that's what Chad went there to check on and to make plans to –

MR. SCALES: Your Honor, I object if the foundation for the information is from Mr. Chad Robinson, we would assert a confidential privilege, and ask it be stricken and the jury disregard the answer.

We ask the witness, be admonished to not testify further with respect to the conversations with Chad Robinson.

THE COURT: Approach.

(Following is sidebar).

THE COURT: Technically the response to the question called for a description of conduct, not a description of communication, that is what Chad went there to check on the plants.

However, I can see that the next question would be how do you know that. He [sic] if she says because he told me that, I see where that might fall within the scope of the privilege.

This witness is getting into an area where it sounds like she's speculating on whether there was a harvest in 1992, and I know you're trying to get to a foundation.

MS. PARKER: I'm trying to get away from that.

THE COURT: I don't think we're getting one. It seems to me in order to establish the foundation – I understand you're doing it in good faith – that you're in danger of encroaching on possibly inadmissible evidence.

MS. PARKER: Well I think it would also – could be patently illegal joint activity if she knew she was going there for that purpose.

THE COURT: That could be the case, except you have already elicited testimony from this witness –

(continued...)

8

Case No. 01-2395/2398/2664/02-1450

During the course of the trial, defendant Hayden's counsel moved for a mistrial based on the questioning of Frances Robinson, J.A. 2214, and was joined by some of the defendants. AUSA Parker responded, stating in part:

> I realize there were times that resulted in rulings in the course of Frances Robinson's testimony that resulted in some of the testimony being stricken. But I think the court indicated it wanted a sidebar, that I was attempting in good faith to lay a foundation and to adduce admissible evidence.
>
> And the one example that comes to my mind is the one about putting the male plants in a plastic bag prior to a -- separating the male plants from female plants in order to generate seeds. I understood from my preparatory interview with Frances Robinson that was something she observed as well as being told about. That would be the kind of thing that -- one of the reasons we think it would be admissible. That's not the way she testified on the stand, but I don't think that in any way constitutes bad faith.
>
> Nor do I think that Mr. O'Farrell has cited anything or any reason to think that the jury cannot follow the court's instructions, I think the court has always made prompt directions to the jury to disregard anything that the court found to be improper. But all matters were offered in good faith, perhaps having a different concept of what was in furtherance.

J.A. 2216.

The district court then denied Hayden's motion for mistrial and stated:

> THE COURT: I'm satisfied that the questions asked by all counsel in this case generally have a colorable basis of validity, and that arguments that are made have also a colorable basis of validity based upon the rules of evidence. My rulings, of course, are based upon my view of what the prevailing law is, taking into account

---

7(...continued)
> (Sidebar ended)
> THE COURT: You may proceed.
> Q.    In 1992 did you have an occasion to see any marijuana growing activity?
> A.    In '92?
> Q.    Yes.
> A.    No.
> THE COURT: Very well, the objection is sustained and the jury is instructed to disregard the previous answer.

9

the context of the testimony as I have heard it thus far, and also issues relating to inappropriate cases balances [sic] the question of unfair prejudice.

There are issues of privilege that were presented in a straightforward way. Those ground rules were outlined. I understand that in the course of trial preparation, sometimes witnesses will testify from the witness stand in a manner differently than they have testified in the given grand juror statements during the course of interviews. And in some cases I would even -- this may surprise you -- but even the summaries of interviews contained in the 302s and other documents might not be exactly what the witness has said in the past.

I don't find a basis to grant the motion for a mistrial at this point. Mr. O'Farrell has requested an admonition, I don't think an admonition is necessary; however, I will advise all counsel that if I detect that there's a question that is asked where there's no good faith basis for the question being asked that the questioner will be admonished and perhaps admonished in front of the jury.

Likewise, if there's an argument made that suggests that any attorney that makes an objection and properly invokes the rules of evidence solely for the purpose of being an obstructionist, if such an argument is made, that argument will be addressed in front of the jury.

Finally, if you believe that there has been some implication, Mr. O'Farrell, by any of the government's arguments, I will invite you to suggest a cautionary instruction to be included in the instructions at the conclusion of trial.

J.A. 2216-18.

Following the convictions, the defendants moved for a new trial and asserted prosecutorial misconduct in the questioning of Frances Robinson. The district court, after citing *United States v. Carter*, 236 F.3d 777 (6th Cir. 2001), for the two-pronged test to determine whether prosecutorial misconduct compels a new trial, opined as to the Frances Robinson testimony, and denied the motion stating:

Even assuming that the various statements during Francis [sic] Robinson's testimony were improper, the defendant simply has not demonstrated how these comments were anything more than isolated and has not explained why the Court's repeated curative instructions that were given and given at the defendant's request,

were incapable of curing any alleged prejudice that the defendant has not identified with respect to Francis [sic] Robinson's testimony.

J.A. 3687.

*Sims*, *supra*, does not address the standard of review when the district court's rulings on the exercise of the spousal privilege are at issue. In this case, in consideration of the penalty exacted on Chad Robinson, we have engaged in a careful and detailed *de novo* review. In applying that strict standard of review, we find no error. The district court was sensitive to and carefully handled the issue.[8] Additionally, we find no prosecutorial misconduct in AUSA Parker's questioning of Frances Robinson.

## B.    The Denial of Francis Hayden's Motion to Suppress

The October 31, 1996 warrantless search of the trailer-residence located adjacent to the farm buildings where the marijuana production flourished prompted the persistent efforts by Appellant Francis Hayden to suppress the fruits of the warrantless search of the trailer-residence and the subsequent judicially-authorized search of the farm buildings which led to the discovery of the magnitude of the marijuana-growing operation as described by James Austin Mattingly. Hayden's efforts to suppress continued even in a post-verdict motion. At all times, his efforts failed on the continuing judicial determinations, first by the assigned magistrate judge, and then by the district court, on the basis that Hayden lacked standing to pursue the Fourth Amendment claim.[9]

---

[8] As we find no error on a *de novo* standard of review, we express no opinion as to whether such a standard is required or whether the standard should be abuse of discretion.

[9] We pause to reflect on the nature of the warrantless search on October 31 because, in our view, the search was conducted under what we find to constitute exigent circumstances in the absence of a similar finding by the district court. "The Fourth Amendment does not bar police officers from making warrantless entries and searches when they

(continued...)

*United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir. 1993) teaches that the standard of

review as to motions to suppress is based on two complimentary standards: the district court's

---

[9](...continued)

reasonably believe that a person within is in need of immediate aid." *Thacker v. City of Columbus*, 328 F. 3d 244, 253 (6th Cir. 2003). Some courts have found that a 911 call reporting an emergency, without more, may be enough to support a warrantless search of a home. *See, e.g.*, *United States v. Cunningham*, 133 F. 3d 1070, 1072-1073 (8th Cir.) (finding 911 call from woman who identified herself and claimed she was being held against her will justified a protective sweep of dwelling), *cert. denied*, 523 U.S. 1131 (1998); *United States v. Richardson*, 208 F. 3d 626, 630 (7th Cir.) (concluding that a 911 call where caller identified himself and stated that "Lucky" had raped and murdered a woman whose body could be found in the basement of a particular address was enough to support a warrantless search under the exigent circumstances exception), *cert. denied*, 531 U.S. 910 (2000). When police respond to a tip that a person inside a dwelling may be in need of aid, however, they may only be justified in entering the home if they observe facts indicative of exigent circumstances when they arrive outside the home. *Thacker*, 328 F. 3d at 254 n. 2.

In this case, Sheriff's Deputies went to the Argyle Road Farm in response to a neighbor's call stating that horses had been loose and that he had not seen the owner of the horse, Hayden, for several days. That neighbor, James Knowlton, requested that the officers check on the welfare of the owner. (J.A. 2263-2268.) There is no evidence that the officers had any other reason or suspicion for investigating the farm than concern for the occupant's welfare. Deputy Ed Jarosz and Sergeant Biniecki, who had been in the area of the farm on other matters, went to the farm about two hours after Knowlton's call. (J.A. 1256). The officers went to the trailer home located on the farm to check on the well-being of the resident. They went to the back door of the trailer and knocked and announced a couple of times but no one answered. (J.A. 1259). Jarosz then turned the doorknob of the shut back door and found it unlocked, so he entered to check on the welfare of the occupant. (J.A. 1259-1260). He found no one, but noticed the furnace was running and there was a slight odor of oil. (J.A. 1260). Jarosz also noted that there were things on the table of the trailer "that you just wouldn't leave on the table if you were leaving," such as a carton of cigarettes and an open package of Oreo cookies. (J.A. 1262). Jarosz testified that usually when checking on the well-being of persons in their county, officers would find the person sick or deceased in the bathroom or master bedroom. (J.A. 1260). After not finding anyone in the bathroom, the officers went to the master bedroom and scanned it with a flashlight. There they observed a plastic bag of marijuana on a dresser. (J.A. 1261). The officers continued to scan the trailer and saw marijuana in an ashtray on the coffee table of the living room and in an ashtray on the kitchen table. (J.A. 1262). The officers did not open drawers or investigate the marijuana more closely. Finding no one in the trailer, the officers left and went to look at the outbuildings. The officers heard a dog barking inside the barn, but the barn and other outbuildings were locked from the outside with padlocks, so they did not enter. (J.A. 1263-1264). Jarosz went back to the trailer and secured the area while Biniecki went to the office to secure a search warrant for the property. (J.A. 1264).

Hayden argues that there was no urgency for the officers to search the trailer, and consequently that the officers' warrantless search of the trailer did not fall under the exigent circumstances exception to the prohibition against warrantless searches. (Hayden Br. at 44). Hayden points to the fact that the officers arrived two hours after Knowlton's call, first finishing their other business in the area. Additionally, Hayden states that the officers did not observe anything unusual about the outside of the trailer, nor did they find any evidence inside the trailer that someone was injured or ill. (Hayden Br. at 45).

Hayden's arguments fail to demonstrate lack of urgency. First, although the officers arrived two hours after the neighbor's call, Hayden did not provide any evidence as to when the officers in the field received the request to investigate or how long it took the officers to travel to the Argyle Road farm, nor any evidence regarding the level of emergency of the matter that the officers were attending to prior to investigating the Argyle Road farm. Second, the combination of the facts that the trailer was located on a farm where an occupant would be isolated, that animals on the farm had escaped and run free, that the neighbor had not seen Hayden for days and was concerned about his well-being, and that the door to the trailer was left unlocked but the heat was left on, was enough to give the officers a reasonable belief that Hayden, the occupant of the trailer, was in the trailer and in need of immediate aid.

findings of fact are upheld unless clearly erroneous, whereas the district court's legal conclusions are reviewed *de novo*. The standard of review focusing on issues relating to standing with respect to motions to suppress on grounds of Fourth Amendment violations was alluded to in *United States v. King*, 227 F.3d 732 (6th Cir. 2000). Although the standard of review was not addressed specifically, the *King* court appears to have concluded that the district court's findings of fact were clearly erroneous in its reversal of the ruling that the defendant lacked standing. *Id*. at 749-50. Consequently, we conclude that we should review the fact-findings of the district court using a clearly erroneous standard and the legal conclusions using a *de novo* standard.

Hayden's initial motion to suppress was filed on February 22, 2000. J.A. 212.[10] The assigned magistrate judge conducted a hearing on the motion to suppress on May 19, 2000. His Report and Recommendation declared that counsel agreed that the standing issue should be decided prior to any testimony or argument on the underlying issues regarding the propriety of the search. J.A. 320.

---

[10] The motion was eventually supplemented by Hayden's May 24, 2000 affidavit which declared:

1. That he is a competent person and that the facts set forth herein are true based upon his personal knowledge and/or information and belief.
2. That on October 31, 1996 and prior thereto, he was in lawful possession of the residence located [at] 5647 Argyle Road in Sanilac County, Michigan.
3. That on October 31, 1996 and prior thereto, he had exclusive possession of the residence and exclusive control of the residence at which he was staying.
4. That police entry into the home, the search thereof, and seizure of items from the home was in violation of his privacy and legitimate expectation that no one would enter the home without his knowledge, permission, or consent and that he did not give any consent real or implied to the police for the illegal entry of the home.
5. That items taken from the home included personal property owned by Defendant including a small quantity of marijuana kept by Defendant for his personal use in the bedroom of the home.

J.A. 248-49.

13

After considering the arguments of counsel and the documents presented by the government, the August 18, 2000 Report and Recommendation concluded with the observation that Hayden had failed to meet his initial burden of demonstrating that he had a legitimate expectation of privacy in the residence searched and, thus, lacked standing. J.A. 328-29.[11]

---

[11] The Report and Recommendation of Magistrate Judge Charles Binder set the stage for the factual findings that withstood the assault of repeated motions for reconsideration on the search issue. We quote in part from Magistrate Judge Binder's report as follows:

> The documents provided by the Government relating to 5647 Argyle Road include a purchase agreement for the property dated January 27, 1995, which bears Mark Robinson's signature as the buyer and David C. Bullock's as the seller, (*see* Dkt. 182, Att. C); closing documents from the sale, such as the cashier's check showing Marcus Robinson as the remitter and the title insurance papers; a lease agreement dated April 19, 1995, which states that Marcus Robinson leases the property (including 55 tillable acres, the barn, and the trailer) to John Hunt for the period of May 1, 1995 to May 1, 1998, and that Mr. Hunt is not allowed to sublet the premises without Robinson's consent, (*see id.,* Att. F); and approximately twenty-two pages of farm operation documents, such as fuel invoices and cancelled checks from 1995 and 1996 which bear the names of John Hunt and Tom Miller. (*See id.*, Att. E).
>
> Also provided by the Government is a transcript of a telephone conversation between Administrator William Gray of the Sanilac County Sheriff Department and Marcus Robinson which took place on November 13, 1996. From the transcript it appears that Mr. Gray was returning Robinson's call, and the subject of conversation was Robinson's recent discovery that an affidavit for search warrant was affixed to the door of the trailer at his Argyle Road property. During the conversation, Robinson states at least twice that he rented the place to "John" and he's never heard of anyone named "Frank." Robinson states that if someone other than John is in there, they're not supposed to be. (*See id.*, Att. D).
>
>     \*   \*   \*
>
> Defendant has failed to claim any ownership interest in the location searched. The government alleges that Defendant did not have lawful possession or lawful control of the property. Professor LaFave's treatise on the Fourth Amendment directly addresses this situation:
>
> > The burden is on the defendant to establish that his presence was not wrongful, and this burden is not met by merely establishing that the premises are not occupied by anyone else or that the premises belong to a friend. Usually, what is required is a showing that a person authorized to do so gave permission for the defendant to be present on that particular occasion, although such a particularized consent need not be shown if by custom the defendant was allowed to come on the premises whenever he chose to do so.
> > 5 Wayne R. LaFave, Search & Seizure §11.3(b)(3d ed. 1996) (footnotes omitted).
>
> The Sixth Circuit's *McRae* decision, *supra*, bears out this rule. In *McRae*, the defendant argued that he had a legitimate expectation of privacy in a house where he had been living by himself for a week. *See McRae*, 156 F.3d at 711. In rejecting his claim, the court stated that he "did not have a legitimate expectation of privacy by virtue of having stayed a week in the vacant premises that he did not own or rent." *Id.* In support of its conclusion, the court cited two cases which are instructive here. The first, *United States v. Carr*, 939 F.2d 1442 (10th Cir. 1991), held that a defendant's occupancy of a hotel room for three weeks which was not

(continued...)

14

Case No. 01-2395/2398/2664/02-1450

On October 11, 2000, the district court, in response to the timely objections to the August 18, 2000 Report and Recommendation, conducted what was to be considered an evidentiary hearing limited to a consideration of many investigative statements accumulated by the government and shared with the defendants' counsel. *See* J.A. 3720-75. At the conclusion of the hearing, the district court overruled the objections to the Report and Recommendation and declared:

> Now if there was evidence that the defendant had dealt with the record title holder of the property and obtained permission, or was employed as a caretaker by someone else who was in lawful possession of the premises and given permission to stay there by that person, or had entered into an agreement, written or oral, with someone who had lawful possession of the premises which would have allowed the defendant to be present there, occupy the residence and maintain a degree of

---

[11](...continued)

registered to him or to anyone he was sharing it with could not be the basis of a legitimate expectation of privacy because the defendant had no lawful possession or lawful control of the premises. *See id.* at 1446. The second, *United States v. Gale*, 136 F.3d 192 (D.C. Cir. 1998), held that a defendant who changed the locks on an apartment rented to someone else and used it for packaging drugs had no legitimate expectation of privacy in the apartment because he did not have legal authority to be there. . . .

In this case, then, the question is whether Defendant has met his burden of showing that the person authorized to do so gave Defendant permission, or lawful control of, the mobile home on the Argyle Road property. To this end, the sole evidence before this Court is Defendant's sworn statement that he had exclusive lawful possession and control of the residence. (*See* Aff., Dkt. 174). Defendant's conclusory assertion, however, is contradicted by the numerous documents demonstrating that the owner of the property at the time in question was Marcus Robinson and the lessee was John Hunt.[ ] Defendant has provided no evidence whatsoever that either Marcus Robinson or John Hunt gave him permission to occupy, the mobile home on Argyle Road. . . .

I further suggest that Defendant's argument that he has standing because he has admitted ownership of a small quantity of marijuana seized from the mobile home fails to carry the day. It follows naturally from the case law cited above that merely claiming an ownership or possessory interest in an item seized does not automatically confer standing to challenge the seizure of that item. The Supreme Court expressly rejected such "automatic" standing, and has made clear that the appropriate inquiry under the Fourth Amendment is "not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched." *United States v. Salvucci*, 448 U.S. 83, 93, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Having already suggested that Defendant has failed to show that he had a legitimate expectation of privacy in the area searched, I further suggest that Defendant's claim of ownership of one small quantity of marijuana seized does not alter the conclusion that the evidence is not subject to suppression under the Fourth Amendment.

J.A. 324-29.

15

possession and, therefore, an expectation of privacy, the court might be persuaded otherwise.

However, I find that that evidence simply does not exist in this case and, therefore, the defendant has not carried his burden.

For those reasons, the defendant's objections to the magistrates report and recommendation are overruled and the motions to suppress are denied.

J.A. 3772.

On November 30, 2000, Hayden moved for reconsideration of his motion to dismiss. *See*

J.A. 350.[12]   The motion was accompanied by a second affidavit of Hayden.[13]

---

[12] The isolated commentary of the district court during the hearing conducted on October 11, 2000, to the effect that he questioned the exigent circumstances for the warrantless search of the house trailer may have prompted the repeated efforts by Hayden's counsel to secure a favorable ruling on his motion to suppress. Specifically, the district court stated: "In this case, the officer made the entry into the house trailer, the residence, if you will, did so without a warrant, without probable cause and as far as I could tell, without any exigent circumstances which would have excused obtaining a warrant." J.A. 3769.

[13]   The second affidavit of Hayden dated November 27, 2000 follows:

1.      That he is a competent person and the facts set forth herein are true based upon his personal knowledge, information, and belief.

2.      That in late February or early March, 1996, while seated in a bar in Bardstown, Kentucky a person entered the bar, sat next to him and a lengthy conversation ensued.

3.      That the man was approximately 5 foot 8 inches to 5 foot 9 inches tall, weighed approximately 185 to 200 pounds and is estimated to be in his late 30's or early 40's and identified himself as John Hunt.

4.      That he and "John Hunt" talked for a lengthy period of time and Defendant told "Hunt" of his domestic situation, that he was having marital problems and was thinking of getting out of the area for a while.

5.      That during the conversation "John Hunt" asked Defendant if he would [be] interested in making some money by working for "Hunt" on a farm located in Michigan.

6.      That after some discussions Defendant agreed and was given some travel money by "Hunt" at the time and was given a specific address for the farm with an agreement that Defendant would go to the location and handle the care taking of the farm during the course of the growing season.

7.      That it was explained to Defendant that all of the bills for utilities, etc. would be handled and that Defendant would be paid through the summer for all of his expenses and well paid for work he performed on the farm.

8.      That the conversations set forth above were the only time that Defendant had any personal contact with the man who identified himself as John Hunt.

9.      That sometime in March or April, Defendant did, pursuant to his agreement, come to the

(continued...)

16

---

[13](...continued)

farm, obtain the keys to the trailer at the location where he was advised they would be and attempted to open the trailer for the season including making repairs in water lines and the pumping system which were necessitated by damage resulting from freezing over the winter.

10. That Defendant stayed at the trailer only a short time and could not complete the repairs because of the odd sizes of the plumbing fixtures in the trailer but did subsequently return to the trailer and hired a plumbing and heating contractor located in Cass City, Michigan to repair the pipes and install a new pump with the work being billed to "John Hunt" and paying for the repairs in cash by Defendant with money which was left at the trailer for him.

11. That Defendant did occupy the trailer and maintain the farm during the growing season of 1996, staying there or traveling from time to time to his home in Kentucky and spending almost all of the time at the trailer after approximately the end of July 1996 through the end of the growing season.

12. That during planting time individuals came to the farm with hand planters and did sow marijuana in the field where it was subsequently located after harvest by police authorities in this case.

13. That weather conditions washed out the plantings on two or three occasions requiring that the crop be re-sewn [sic] which was finally accomplished sometime in July 1996.

14. That while staying at the trailer, although Defendant had no personal contact with "John Hunt", money was left from time to time at the trailer for expenses and compensation.

15. That while staying at the farm Defendant did order and obtain delivery of diesel fuel and kerosene and paid invoices for these deliveries using money orders obtained at the local post office utilizing the cash left at the trailer.

16. That pursuant to his agreement made with the man known to him as John Hunt at their initial meeting, the money orders were placed in the name of John Hunt.

17. That further, based upon the instructions of the man known to Defendant as John Hunt, he attempted to sell corn stored at the farm from the previous year to Ernest Bullock as instructed by John Hunt.

18. That based upon his oral agreement with John Hunt, Defendant did occupy and possess, maintain and manage the farm including the trailer, barn, and fields during the growing season of 1996.

19. That Defendant did exclusively occupy the trailer located at the farm and kept the trailer locked, maintaining exclusive control over it and that when other individuals came to plant or work at the farm they stayed at facilities located within the barn.

20. That at the time police came to the location allegedly to check for horses being loose Defendant was temporarily away from the farm but was still occupying the trailer and in possession of the farm.

21. That when Defendant met "John Hunt" personally, Mr. Hunt appeared to have substantial cash and Defendant relied upon Mr. Hunt's representations that if he undertook working for Mr. Hunt in managing the farm then he would be compensated and that this provided an opportunity for Defendant to get away from his personal domestic problems and seemed to be a situation fitting his then existing needs.

22. That in following the directions of Mr. Hunt to the farm and all times at the farm, the situation conformed with the agreement that had been reached with Mr. Hunt and Defendant occupied and maintained the farm pursuant to that agreement.

23. That in conversations with neighbors, as reflected in the discovery materials already submitted to this Court, Defendant did represent to the neighbors that he was there managing

(continued...)

17

Case No. 01-2395/2398/2664/02-1450

On February 21, 2001, the district court denied the motion for reconsideration and declared

in part as follows:

> The defendant's affidavit establishes that he obtained permission to occupy the farmhouse and act as caretaker of the farm from a "John Hunt." The defendant met "John Hunt" in a bar in Kentucky in February or March 1996, but had no contact with him thereafter. The defendant offers information which suggests that John Hunt had some connection with the premises. However, there is nothing in the record at this stage of the proceedings that shows John Hunt's relationship to the property, and the record is silent on Mr. Hunt's authority to allow someone to stay there.
>
> Further, the defendant avers in his affidavit that his duties of maintaining the farm during the growing season of 1996 included sowing marijuana in the field. In *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court stated that where the presence of an individual on someone else's property was for the purpose of a commercial, criminal enterprise, that person does not have a legitimate expectation of privacy in the premises which would permit the occupant to enforce his or her Fourth Amendment rights.

J.A. 377.

On May 10, 2001, on the eve of trial, the district court conducted a motion hearing on

Hayden's persistent efforts to suppress. *See* J.A. 3821. At the conclusion of that hearing, the district

court again denied the motion to suppress and opined:

> But based upon the information that I have before me, I am still of the view, as stated in my memorandum opinion of February 2nd, that the sole purpose of the defendant's occupancy of the farm and the residence was to engage in the grow project which is the subject of the indictment. And, as a consequence, I still believe that the case is governed by Minnesota -vs- Carter, and not Minnesota -vs-

---

[13](...continued)

> the farm for "John Hunt" and the neighbors seemed to recognize the name and acknowledge that Defendant's occupancy of the farm by agreement with Mr. Hunt comported with their understanding of the ownership and use of the property.

24. That at all times during his occupancy in management of the farm Defendant acted pursuant to the oral agreement and understanding which he had reached with the man known to him as John Hunt.

J.A. 389-94.

18

Olsen.(sic) [14]  It is also governed by the other decisions such as United States -vs-McCray[15] (sic)  and United States -vs- Carr,[16] which is cited in that opinion.

And for those reasons, the court will deny the motion.  An order will follow.

J.A. 3841-42 (footnotes added).

After the conclusion of the trial on June 12, 2001, Hayden filed on August 8, 2001 a post-verdict motion to suppress, claiming  prosecutorial misconduct in the cross-examination of James Curtis Mattingly and that the suppression of evidence concerning the witness Knowlton prevented

---

[14] The case to which the District Court referred is *Minnesota v. Olson*, 495 U.S. 91 (1990).  In *Olson*, the Supreme Court found that the respondent Olson had an expectation of privacy as an overnight guest in the home of the host so as to challenge his warrantless arrest on the basis of his Fourth Amendment rights.

[15] The case to which the District Court referred is *United States v. McRae*, 156 F.3d 708 (6th Cir. 1998).  The *McRae* court affirmed the district court's conclusion that McRae did not have a legitimate expectation of privacy by virtue of having stayed a week in vacant premises that he did not own or rent, and thus lacked standing to suppress the fruits of a warrantless search.

[16] The District Court refers to *United States v. Carr*, 939 F.2d 1442 (10th Cir. 1991), which found that the defendant who moved to suppress evidence seized from a hotel room he was occupying lacked standing because the room was rented to a third person and no evidence was presented to demonstrate that Carr had an expectation of privacy in the hotel room.

19

Case No. 01-2395/2398/2664/02-1450

Hayden from establishing standing.[17] Again, the district court gave consideration to the latest effort

to establish standing in a hearing conducted on March 8, 2002, and then declared:

---

[17] Relevant portions of Hayden's post-conviction motion for reconsideration of his motion to suppress follow:

4.      That discovery materials provided prior to trial to Defense Counsel did not disclose any reference to "James Noltan".
     *   *   *

8.      That subsequentally (sic) as the trial continued the U.S. Attorney indicated their intent to call witness, "James Knolton", identifying him as the man from Shebonna who had made the original call concerning the horses being loose and that Mr. Knolton was called as witness, testifying on the afternoon of May 29, 2001.

9.      That Mr. Knolton testified as relevant hereto that he had observed the horses loose at the farm and had called 911 and subsequentally (sic) returned to the farm where he met with police during the time of their initial arrival and search of the premisses (sic) and that he had provided his name and identifying information to the police at the time and had subsequentally (sic) provided care for the horses on a short term basis through arrangement with the police but had not heard further from the police until being served with a Subpoena approximately one month prior to his testimony.

10.      That on the basis of the testimony of Mr. Knolton, inquiry was made about police reports and a four page report, a copy of which is attached hereto as Exhibit 1, was for the first time provided to Defense Counsel concerning the contact with Mr. Knolton, (which was misspelled, Noltan) and which for the first time disclosed to Defense Counsel the identity of the party who had called police concerning the horses being loose.

11.      That the existence and identification of Mr. Knolton and the information that he was present at the time of the initial search giving rise to the motions to suppress on behalf of Defendant was critical to Defendant's ability to properly present this issue to the Court and was wrongfully withheld from Defense Counsel through the course of all of the extended motions and briefing attempting to present this issue on behalf of Defendant.
     *   *   *

19.      That the Government's position in this cause opposing the motions of Defendant to suppress evidence on the basis of his alleged lack of standing has purposely withheld information from Defense Counsel and this Court impeding Defendant's ability to present this issue to the Court.

20.      That the Government in asserting that Defendant failed to meet his burden of proof to establish standing has purposely misled this Court as to the factual circumstances of the purpose and use of the home searched by police and misled this Court that the facts and circumstances fall within the ambit of *Minnesota v. Carter* when the Government presented full evidence at trial to support a narrative contradicting the facts as represented to the Court in seeking to prevent the exclusion of evidence on the basis of the illegal search and seizures at the residence occupied by Defendant.

21.      That justice requires that this Court, pursuant to the Local Rule made and provided, reconsider its denial of Defendant's motions to suppress in light of all of the evidence now before it and hold that the motions should be granted.

20

The Government has filed a response to this motion but the Court will treat it as a motion for reconsideration. The *United States vs. McRae* [case] which I cited earlier. The Court of Appeals held that the defendant has the burden of showing that a person with authority had given him permission to occupy the premises. That was the primary basis for the Court's ruling. The Court, with all due respect Mr. O'Farrell, does not find that there is anything that has been presented since the Court has ruled initially and on reconsideration and in a written opinion on reconsideration in the Court's file which changes my view of the ultimate ruling in the case. I do not find that there has been a mistake that was made or that there is any palpable error. Therefore the motion for reconsideration of the order denying reconsideration of the order denying the motion to suppress is likewise denied.

J.A. 3695. The ruling was then memorialized by an order filed on March 11, 2002.[18] J.A. 649.

After our careful review of the record, we find no error on the issue of standing. The district court had before it the lease agreement purportedly between Mark Robinson and John Hunt of Bad Axe, Michigan. The lease provided that it was to begin on May 1, 1995 and end on May 1, 1998. The lease agreement bore the signature of John Hunt. The lease also provided that John Hunt was not to sublet the premises defined as "fifty-five (55) tillable acres, including the barn and trailer, located on Argyle Road, Cass City, MI." J.A. 683. The district court found repeatedly that the defendant Francis Hayden was unable to demonstrate the right to be on the premises because he had

---

[18] The court's order stated in its entirety as follows:

ORDER DENYING DEFENDANT'S POST-TRIAL MOTION

On August 20, 2001, the defendant filed a Renewed Motion to Dismiss Enhancement Penalties, Second Motion for Reconsideration of Defendant's Motion to Suppress Evidence, and a Motion to Dismiss Indictment on Grounds of Prosecutorial Misconduct.

The Court entertained the arguments of the parties through their respective counsel in open court on March 8, 2002.

Accordingly, for the reasons stated on the record, it is ORDERED that the defendant's Renewed Motion to Dismiss Enhancement Penalties [dkt #313], Second Motion for Reconsideration of Defendant's Motion to Suppress Evidence [dkt #314], and Motion to Dismiss Indictment on Grounds of Prosecutorial Misconduct [dkt #316] are all DENIED.

J.A. 649.

no consent of the first party to the lease, *i.e.*, Mark Robinson.[19] We affirm the district court's ruling finding that Francis Hayden had failed to establish any legitimate right to be on the premises and thus lacked standing to challenge the warrantless search of what he contended was his trailer residence. We find that the district court thoroughly and patiently considered Hayden's Fourth Amendment claims, before and after trial, and we find no error in his rulings.

## C.    The District Court's Evidentiary Rulings Under Fed. R. Evid. 801 (d)(2)(E)

James Austin Mattingly, identified as one of the members of the vast conspiracy, testified that Ralph Medley, during the year 1995, offered an explanation on how the profits from the growing of marijuana were to be distributed. In the process, Medley told Mattingly that the owners of the farm, the "Robinsons," were to receive the larger share of the profits. *See* J.A. 1823-26. Prior to allowing the testimony, the district court reviewed the anticipated testimony, and held:

> I think it's fair to infer that the efforts that were being engaged in were for profit. This was not a science project. I think that because the enterprise was to make money, a discussion about dividing the spoils or the profits is exactly within the scope of the enterprise and describes information and conversation that is in furtherance of that money making enterprise: therefore, the objection is overruled.

J.A. 1809.

Subsequently, at the conclusion of the trial, the district court ruled that the statements of the co-conspirators were unconditionally received pursuant to Rule 801(d)(2)(E).[20]

---

[19] *See* J.A. 683 for a copy of the lease agreement.

[20] The court stated:

> Oh, under the applicable standard, I believe the court has to determine by a preponderance of the evidence that a conspiracy exists, that the statements were made by individuals in furtherance of the conspiracy, and that the defendants against whom the statements were offered had joined or

(continued...)

22

Case No. 01-2395/2398/2664/02-1450

We reject Marcus Robinson's argument on appeal that the standard of review as to whether the district court erred in allowing the Rule 801 evidence is subject to *de novo* review.  Rather, we find the standard of review is abuse of discretion.  *See  United States v. Mack,* 258 F.3d 548, 553 (6th Cir., 2001); *United States v. Mick*, 263 F.3d 553, 566 (6th Cir. 2001).

We find that the Medley statements, as related by Mattingly, were made during and in furtherance of the conspiracy.

In this case, the district court carefully and conservatively applied Rule 801(d)(2)(E) and excluded certain statements as not admissible under the Rule.[21]

We also note that the testimony of co-conspirators Frances Robinson, James Austin Mattingly and James Steffens,[22] along with the testimony of the Michigan residents, when coupled with testimony regarding the purchase of the 78-acre farm by the Robinson brothers, Chad and Marcus, along with the subsequent denials of the Robinson brothers, supported the indictment's allegations of a conspiracy.

We find no error in the district court's admission of testimony pursuant to Rule 801(d)(2)(E).

---

[20](...continued)
were members of the conspiracy.

> And the court does make a determination, based upon a preponderance of the evidence that the court has heard, that all of those elements are satisfied, and the statements that were conditionally admitted – the extent they 801D2(e) – are admitted.

J.A. 3288-89.

[21] Consequently, the court repeatedly excluded testimony offered under Rule 801(d)(2)(E). *See, e.g.*, J.A. 1844-62; 2355-72; 2375-78.

[22] James Steffens, under a grant of immunity, provided extensive testimony regarding his many purchases of marijuana from co-conspirator Ralph Michael Kough and, in the process, incriminated Marcus and Chad Robinson.

**D.    The District Court's Denial of Marcus Robinson's Rule 29 Motion as to the Conspiracy Count**

The district court took under advisement Marcus Robinson's Rule 29 motion for a directed verdict on Count 1 and then overruled the motion in a post-verdict setting. *See* J.A. 3520-21. That ruling is challenged on appeal as Marcus Robinson, citing *United States v. Campion,* 560 F.2d 751, 753 (6th Cir. 1977), contends that his conviction for conspiracy should be reversed because there was no direct evidence of his participation in the conspiracy and the circumstantial evidence is both insufficient and equally consistent with innocence.

Our review of the record finds ample evidence to support the conviction of Marcus Robinson on the crime of conspiracy as set forth in Count 1 of the third superceding indictment, even though there was no direct evidence that Marcus Robinson participated in the actual growing and harvesting of the marijuana in 1995 or 1996 on the Michigan farm.

The appellant's reliance on *Campion*, *supra*, is misplaced. First, that decision, relating to a gambling conviction, does acknowledge that circumstantial evidence alone may sustain a guilty verdict even if it fails to exclude all reasonable hypotheses consistent with a theory of innocence. The opinion goes on to hold that, when the jury is called upon to choose between "reasonable probabilities" of equal weight, one innocent and the other criminal, a conviction cannot stand. Against that background, we set forth a summary of evidence[23] pointing to the guilt of Marcus

---

[23] A summary of the incriminating evidence follows:

      1. The buyer for the farm (Argyle Road) was identified as Mark A. Robinson on the purchase agreement (J.A. 1496) and he paid the balance for the farm of $87,923.58 by a cashier's check remitted by Marcus A. Robinson on an Indiana credit union. J.A. 1497-98.

(continued...)

[23](...continued)

2. Five grain checks were issued by a grain elevator in February of 1996 and one of the checks made payable to John Hunt was deposited in Robinson's account. J.A. 2600.

3. Robinson came to the adjacent Stone Road property in July of 1996 in an attempt to purchase it. It constituted 40-80 acres with an older mobile home. Robinson left a check for $500 to purchase the property but the offer was rejected. J.A. 1673-75.

4. William Gray, Director of the Sanilac County Drug Task Force, was sent a copy of the lease for the Argyle Farm showing it was signed by John Hunt on April 19 and by Robinson on April 22, 1995. The copy was sent by Marcus Robinson. J.A. 1748-49; 1752.

5. Robinson told Gray that he had been to the property in November of 1996 and found the search warrant affidavit and would come to the property and inspect. J.A. 1761-64.

6. In 1996, Steffen testified that Kough introduced him to defendant and to Chad Robinson, that marijuana was smoked, and that he gave cash to Kough but could not remember whether Chad or Marcus was present. J.A. 2221.

7. Frances Robinson testified that she heard discussions between Chad and Marcus Robinson regarding using R Motors as a cover for the sale of marijuana. J.A. 1947-48.

8. Marcus Robinson drove cars from R Motors to and from Kentucky with marijuana. J.A. 1949-50.

9. Frances Robinson reported that R Motors was a place where Chad sold marijuana but that R Motors was not open on Sundays. However, she testified that she saw Marcus Robinson meet at the garage on Sunday with the same people to whom Chad sold marijuana during the week. J.A. 1972-73.

10. Indiana DMV records listed both Marcus and Chad Robinson as owners of R Motors. J.A. 2007.

11. Marcus Robinson, when interviewed by Gray in January of 1997, brought the copy of the lease with John Hunt. J.A. 881-82; 1761; 2694; 2821-22.

12. Marcus Robinson advertised the farm for rent in local papers in March of 1995 using his first name and the R Motors phone numbers in the ads. J.A. 2833-35.

13. Robinson said that the grain elevator checks deposited in his account were payment against arrearage in rent and a payment of rent in advance by John Hunt. J.A. 2838.

14. During a taping of his statement to Gray, Robinson asked for the tape to be stopped and in the hiatus told Gray that the money to purchase Argyle came from a "side account" of which his wife was not aware. J.A. 2668. Robinson said he saved money from his Alcoa paycheck through the credit union and intended to buy the property which could be hidden from his wife from whom he expected to be divorced. J.A. 2669.

(continued...)

25

Robinson. We find no reasonable probability of innocence in our review of the record, nor is any suggested by Marcus Robinson on appeal.

In conclusion, we find the evidence amply supports the jury's verdict on Count 1 as to Marcus Robinson.[24]

## E.    The Multiple Claims of Prosecutorial Misconduct

The four appellants cite numerous examples of what they label as prosecutorial misconduct. The district court refused to find any prosecutorial misconduct. Having carefully examined the claims, we agree. Our analysis follows.

### 1.    The James Austin Mattingly Testimony

A squabble developed between the district court and AUSA Parker regarding the issue of whether the appellant Dennis Miles should be charged with additional levels in the computation of the adjusted offense level for his role in the offense. The squabble gave rise to the claim of

---

[23](...continued)

15. Robinson was unable to produce a paper which showed an address or phone number for John Hunt when he submitted to interview by Gray after the October 1996 discovery of the growing operation. J.A. 2669-70.

16. There was no confirmation of the fact of a person by the name of John Hunt. However, the testifying and cooperating witnesses knew of the use of the name John Hunt but they had no contact with any person by the name of John Hunt and believed the name was being used to hide the true nature of the drug raising operation on the Argyle Road farm. J.A. 1546-51; 1751-53; 2077; 2085; 2130; 2669-70; 2700; 3017-18; 3021-22.

17. Marcus attempted to distance himself from control of the property by use of the fictional John Hunt. J.A. 2669-70; 2700; 3009-10; 3017-18; 3021-22.

[24]  Marcus Robinson also contends that the evidence is lacking to support his three convictions for interstate travel to carry on an unlawful activity, *i.e.*, a business enterprise involving marijuana in violation of 18 U.S.C. § 1952. He also objects to the testimony regarding his financial records and earnings. We find no error with respect to either claim.

prosecutorial misconduct in presenting the testimony of cooperating co-conspirator, James Austin Mattingly.

The primary witness against Dennis Miles was James Austin Mattingly from Kentucky, who was also indicted and subject to a ten-year mandatory minimum sentence. However, the government made a downward departure motion for substantial assistance and he was sentenced prior to the jury trial of the four appellants. The government recommended a credit of five years, but the district court departed downward to a three-year sentence. Mattingly testified that he was recruited by Miles, a friend from Kentucky, to go to the Michigan farm on Argyle Road and assist in planting and harvesting the marijuana crop in 1995. His testimony, which was extensive and very detailed about the growing operation, was devastating to Dennis Miles. *See* J.A. 1776-83; 2070-2151.

However, James Austin Mattingly became very vague about how his share of the marijuana crop raised in 1995 (83 pounds) was converted to cash of about $50,000. *See* J.A. 1872-75. But after a recess for the testimony of Frances Robinson, Mattingly admitted that he wanted to keep the name of the person who sold his share of the marijuana secret, and admitted he had not been truthful on that subject. The fact of the false testimony was developed by the government. *See* J.A. 2072.

At the sentencing hearing of Dennis Miles, the government argued for a role in the offense addition. During that hearing, the district court referred to the testimony of James Austin Mattingly and stated:

> The question about whether Mr. Miles exercised his supervisory role, however, is a different question altogether. We do have the testimony of James Austin Mattingly who indicated that he was contacted by others, including Mr. Miles, to participate in this activity.

Mr. Austin Mattingly, I would hasten to add, admittedly gave false testimony before this court; the court then is put in a position as to how to evaluate Mr. Mattingly's testimony.

Mr. Mattingly did describe generally the activities that occurred on the farm and his role in the offense, and he described them in broad brush terms which, in general, were reliable. *When it came down to details, however, and those details had to do with protecting other individuals whom he did not want to implicate, such as the person who bought the marijuana from him, converted the product into cash, if you will -- Mr. Mattingly was -- Austin Mattingly was perfectly willing to shave the truth if not outright prevaricate.*

And I conclude that Mr. Austin Mattingly engaged in the same conduct that is described by his own activity, that is to minimize. The way to minimize his own activity would be to enhance other activity. *Therefore, I don't believe Mr. Austin Mattingly's testimony on the question of Mr. Miles' participation in the activity as reliable.*

J.A. 3623-24 (emphases added).

Subsequently, the district court declined to add levels for role in the offense and sentenced Miles to the minimum sentence of 121 months. J.A. 3625.

The government then filed a post-trial motion to resentence James Austin Mattingly because of his false testimony. J.A. 624. The district court heard that motion on March 8, 2002; he denied the motion and made statements that energized the defendant Miles in his appeal.

Specifically, the district court and AUSA Parker stated in passing as follows:

THE COURT: Is it the Government's position that Mr. Mattingly testified falsely at trial?

MS. PARKER: I think it is the Government's position as to the disposition of his share of the Marijuana crop, as I indicated in my motion. I think --

THE COURT: Of course and then he corrected that testimony later; is that correct?

MS. PARKER: Yes.

28

THE COURT: Other than that, is it the Government's position that Mr. Mattingly testified falsely at trial?

MS. PARKER: *It is not. However, I don't think that is the bottom line. I think the Court has made findings, and based on those findings there is a requirement essentially that, based on those findings, that the resentencing is necessitated in order to properly apply the law, including the guidelines and the provisions of law for departure.*

* * *

MS. PARKER: Your Honor, if it were only the matter on which the Defendant ultimately corrected himself, I don't think that we'd be here. But the Court made the finding, and I'm quoting from the transcript:

"I don't believe Mr. Austin Mattingly's testimony on the question of Mr. Miles' participation in the activity as reliable."

THE COURT: Should be is reliable.

MS. PARKER: I know, but it says that and I'm quoting.

It further says:

"I do not find Mr. Miles supervised any single individual, although I do find that organization probably involved more than five participants."

That was at odds with Mr. Mattingly's testimony.

Further, the Court found:

"I do not find Mr. Miles exercised any substantial decision-making authority or that he recruited accomplices."

Again, I think that's inconsistent with the testimony which was given by Mr. Mattingly. And it's those findings that I think give rise to the motion.

THE COURT: The Court has reviewed the Government's motion, and frankly I'm somewhat dismayed at the Government's taking the position that Mr. Mattingly testified truthfully at trial, but urging the Court to conclude that he violated the provision of the Rule 11 Agreement which required cooperation as a

condition of the reduced sentence and the motion for downward departure that the Government made.

*The Government clearly here, to me, is trying to have its cake and eat it too.* The Court, based upon its own reasons and those articulated in the sentencing transcript in the Miles case chose not to rely on the testimony of Mr. Mattingly. The Court has that prerogative. It does not compel a finding in this case that Mr. Mattingly necessarily violated the Rule 11 Agreement. And I find no inconsistency in those positions whatsoever.

The Government in the Miles case had an obligation to prove its position on that sentencing by a preponderance of the evidence. The Court found that the testimony of Mr. Mattingly in that regard, given the Court's observations at trial, did not satisfy that requirement.

Nonetheless, the Government took the position in court, and before the jury, that Mr. Mattingly's testimony is truthful. In fact, the Government has taken that position here today; that Mr. Mattingly's testimony is truthful. It is the Government who is advocating that position, yet in the same fashion is requesting that this Court declare a violation of the Rule 11 Agreement because Mr. Mattingly is untruthful.

The Government cannot take that inconsistent position, and I find that there is no basis whatsoever to support the allegations in the Government's motion.

Motion for resentencing is denied.

J.A. 3796-97; 3800-03 (emphases added).

Based on the foregoing events as related to the defendant-witness, James Austin Mattingly, Dennis Miles has cited three claims of prosecutorial misconduct.[25]

---

[25] These claims are:

I.      Mr. Miles' conviction violates due process and/or is against the manifest weight of the evidence where the alleged co-conspirator whose testimony formed the basis of Mr. Miles' conviction: (1) lied on the stand; (2) was specifically found by the trial court to be unreliable with respect to Mr. Miles' role and level of participation in the conspiracy; and (3) was accused by the government of lying in a motion to resentence.

II.     Government misconduct in the presentation of evidence regarding cooperating witness James Austin Mattingly requires reversal of the Mr. Miles' conviction.

IV.     Prosecutorial misconduct was so destructive to Mr. Miles' due process right to a fair trial that

(continued...)

30

The testimony of James Austin Mattingly supports the jury verdict as to guilt. The only instance of admitted lying was first exposed by the government. The comments of the district court in denying the government's position as to the role of Miles in the offense, plus the additional commentary by the district court on the government's motion to resentence James Austin Mattingly, do not require a determination that the testimony of Mattingly was untrustworthy on the very detailed explanations he provided as to the process of growing marijuana on the farm in 1995 and the procedures followed to nurture the marijuana seeds, plant the seeds, cultivate and weed the rows in which the marijuana plants were planted, the construction undertaken in the barn to assist in drying and packaging the marijuana and the efforts to avoid detection, including using false names.

After a thorough review of the record, we find no basis for a determination that the government's handling of the testimony of James Austin Mattingly constituted prosecutorial misconduct.

### 2. The Final Argument of Government's Counsel

Several aspects of the government's final argument are raised on appeal as constituting prosecutorial misconduct and requiring a vacation of the convictions. We review the claims under a clear error standard of review as no objection was raised during or immediately after the final arguments and prior to the commencement of deliberations.

### a. The Canning Jar Connection

In her final argument, the AUSA, in summarizing Steffen's testimony, declared:

---

[25](...continued)
> it constitutes reversible error.

31

> He talks about using canning jars, seeing canning jars used to store marijuana in those. Canning jars were found. Chad Robinson also stores marijuana in canning jars. *And he specifically recalls being told when he sees a canning jar---particularly with nice buds of marijuana in it---he's told by Mr. Kough that's from Chad Robinson, or at least from Chad.*

J.A. 3363 (emphasis added).

The AUSA admits error in that statement. Chad Robinson failed to object but, on appeal, indicates that the AUSA made a similar argument in opposing his motion for an acquittal. J.A. 3104-05. Steffen offered no such testimony--called "phantom evidence" by Chad Robinson. On appeal, the AUSA argues that Chad has failed to show that the misstatement was calculated rather than based on good faith but "erroneous" recall of the evidence by the prosecutor and then argues a failure to show that the jury was misled by the misstatements in view of the other evidence regarding Chad's long-term involvement in marijuana manufacturing and distribution, his travels to Michigan from Indiana to participate in the purchase of the Argyle Road Farm and his attempted purchased of the Stone Road Farm. The issue is whether the departure from the evidence about the canning jars, even without objection, constitutes prejudicial error requiring a reversal. We find that the district court repeatedly advised the jury that statements of counsel did not constitute evidence. *See e.g.*, J.A. 1148-50; 1166-67; 3300-01; and 3351-52.

In our view, the misstatement concerning the canning jars, in the context of the overwhelming evidence of Chad Robinson's marijuana growing efforts, does not rise to the level of prejudicial error in this case.

### b. The final argument relating to Frances Robinson's testimony

The appellants point out that the testimony of Frances Robinson about the marijuana growing in the Selvin house in 1992 was stricken as based on a privileged conversation. *See* J.A. 1933-35.

Again, there was no objection to the statement in the final argument, nor a motion for a mistrial, and even though the government appears to admit the mistake as to 1992 in the final argument, it is difficult to find prosecutorial misconduct in this statement which was simply a part of the government's summary during the opening final argument as follows:

> The operation continues into 1992, particularly involving Rex Robinson taking over the farm in Sullivan and growing marijuana there. And again, Chad Robinson is also involved in manufacturing marijuana.

> In that time he has Frances Robinson prepare a space in the basement, a crawlspace of their house, for that purpose, paint the walls white or a light color so they reflect the light better for the plants, put in insulation, obviously, to hang lights, do things of that nature.

> And she's instructed on how to start the plants, wrapping them in paper towels and soaking them and getting those plants started in that way and then into a series of water in cups until they're ready to be transplanted outdoors.

> Approximately two hundred plants were started that year and also, I believe, the next year in 1993. They start in with a group of plants and then they sex them. Remember there was testimony by Frances Robinson that if she spotted a plant that she thought was male, she was to remove it and set it aside so Chad Robinson could be absolutely sure, because he's the expert on the marijuana cultivation here, to be sure that it's a male plant before it was stripped of its leaves and its bud. Because she indicated, they would harvest the male plant anyway, but they would get it out of there so it would work in terms of maximizing the marijuana or THC content in the female plants.

> That's totally corroborated by the testimony of Dennis Steger, remember him way back when we started this case? Dennis Steger was the individual who came in and testified from many, many years in drug investigations, of involvement including marijuana, as to how marijuana is cultivated and processed and distributed. And sexing a plant is one of the things that he described, and that tends to corroborate or confirm the testimony of Frances Robinson.

And her testimony included that Chad Robinson would transplant the plants once they got to a certain size outside, out of doors, to grow. But not on this property, not where he lives.

He was too smart to do that. He would have it go elsewhere. One time he even took her to a brush pile and showed where he had transplanted some marijuana plants out into a brush pile.

He also sexed the plants, along with his friends, but ultimately there would be a harvest, there would be more marijuana brought in, processed and ready to distribute.

*As I indicated, this indoor starting of the plants, from Frances' testimony, was both in '92 and '93.* And also in that time frame, Frances Robinson hears Rex and Chad Robinson discussing plants that Rex has already got going elsewhere, and Chad Robinson asked: Well, how were they doing? And Rex Robinson effectively replied: Well, they're doing so well, they're already transplanted outdoors.

J.A. 3355-57 (emphasis added).

In our view the mistaken reference to the year 1992 does not rise to prosecutorial misconduct as the reference was not prejudicial.

> c. **The alleged bolstering or vouching as to the witness Steffen**

During AUSA Parker's final argument she declared as follows:

Now let's think a bit about the evidence relating to Kough because that's where you have much of the evidence as to the distribution side of this organization. It would do little good to manufacture marijuana, particularly in these quantities, if you didn't have people to distribute. Kough is one of the people that you learn about, though he's not on trial before you, who was involved in distributing the marijuana.

You learned that not only from Frances but also from Jeff Steffen. And, interestingly, they cover two different ends of the time frame. Frances, basically, after the incident with Russell in September of '94 files for divorce and for the most part moves away from the family. Steffen, he's involved with Mr. Kough for an extended period of time but he's involved through August of '97 as a source of marijuana. *His testimony is confirmed* and we'll talk about that in a bit.

34

J.A. 3362 (emphasis added).

Chad Robinson describes the "confirmed" statement as bolstering or vouching because earlier, over defense objection, the government had established that Steffen had agreed "to cooperate and provide truthful testimony" in return for immunity. J.A. 2163.

In our view, use of the word "confirmed" does not constitute impermissible vouching. Rather it is more in the sense of corroboration.[26]

Finally, we examine the question of whether all of the actions of AUSA Parker, when considered under the totality of the circumstances, should require a new trial.

The Sixth Circuit has repeatedly revisited the issue of alleged prosecutorial misconduct in final arguments. The thorough opinion in *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994), summarized the existing precedent in the Sixth Circuit and cited *United States v. Leon,* 534 F.2d 667, 678-83 (6th Cir. 1976), *United States v. Bess*, 593 F.2d 749, 753-57 (6th Cir. 1979), *United States v. Thomas,* 728 F.2d 313, 319-20 (6th Cir. 1984), *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991), and *United States v. Dandy*, 998 F.2d 1344, 1353 (6th Cir. 1993). The *Carroll* court then concluded:

> Now that we have determined that the prosecutor's remarks were improper, the next step under *Leon* and *Bess* is to determine whether the court abused its discretion by denying Appellant's motion for mistrial. If the error was harmless, there was no abuse of discretion.
>
> * * *
>
> Applying the *Leon* factors to determine whether the impropriety was flagrant, it is clear that remarks of the sort that are at issue in the present case have a tendency

---

[26] See *United States v. Walker*, 155 F.3d 180 (3rd Cir. 1998) for a detailed discussion on impermissible vouching.

to mislead the jury and to prejudice the accused. On the other hand, however, these improper remarks were isolated, and there is no indication that they were deliberate. On balance, we conclude that the impropriety was not flagrant. It follows that the *Bess* test applies, and that the Appellant is entitled to a new trial only if proof of his guilt was not overwhelming, he objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury. *See Bess*, 593 F.2d at 757; *see supra* note 6.

All three of these factors apply to the present case. First, the only evidence against Appellant was the testimony of the Patricks; there was no physical evidence linking Appellant to cocaine distribution or to the conspiracy. Thus, it is possible that the prosecutor's improper bolstering of the Patricks' testimony made the difference between conviction and acquittal. Second, although one of the prosecutor's worst remarks was not objected to, *see supra*, note 2, Appellant did object to other improper remarks. Third, the court failed to give a prompt and adequate curative instruction to the jury. We hold that this failure was an abuse of the trial court's discretion. Appellant is entitled to a new trial untainted by improper prosecutorial vouching.

*Carroll*, 26 F.3d at 1389-90 (internal heading omitted).

The *Carroll* opinion set the stage for the subsequent opinion in *United States v. Carter,* 236 F.3d 777, 783 (6th Cir. 2001), under which we examine the AUSA's conduct. *Carter* teaches that, first, the court must decide whether the prosecutor's actions and remarks were improper and then, if they were improper, determine whether the conduct was flagrant. For purposes of the *Carter* analysis, we find that AUSA Parker's isolated factual misstatements were improper. We thus turn to the issue of flagrancy.

*Carter* explains that, in determining flagrancy, the court should consider: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Carter*, 236 F.3d at 783 (*citing Carroll*, 26 F.3d at 1385) (remaining citations omitted). It is our

view that the answers to the four questions are: (1) no; (2) isolated; (3) more likely accidentally; and,

(4) evidence was strong.

Thus, it is our conclusion that the appellants have failed to make out a case of prosecutorial

misconduct that would require a reversal and new trial.

## F.    The Multiple Conspiracy Claims of the Appellants

The appellant Chad Robinson contends that the proof presented by the government

established more than one conspiracy and appellant Dennis Miles asserts a variance between the

indictment and the proofs offered.  At the conclusion of Frances Robinson's testimony, which was

limited to the Indiana operation, at the request of Hayden, Miles and Chad Robinson, the district

court read to the jury the standard multiple conspiracy instructions.  *See* J.A. 2063-69.  The court

repeated the instruction in the final jury instruction, a copy of which was provided to each juror.

The final instruction read:

> Some of the defendants may argue that there were really two or more separate conspiracies involving the marijuana or distribution of marijuana.  To convict anyone of the defendants of the conspiracy charge, the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment.

> If the government fails to prove this, then you must find that defendant not guilty of the conspiracy charge even if you find he was a member of some other conspiracy.

> Proof that a defendant was a member of some other conspiracy is not enough. But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict if the government has also proved that he was a member of the conspiracy charged in the indictment.

> In deciding whether there was more than one conspiracy, you should concentrate on the nature of the agreement.  To prove a single conspiracy, the government must convince you that each of the members agreed to participate in

37

what he knew was a group activity directed toward a common goal. There must be proof of an agreement on an overall objective.

But a single conspiracy may exist even if all the members did not know each other or never sat down together or did not know what roles all the other members played.

A single conspiracy may exist even if different members joined at different times or the membership of the group changed.

These are all things you may consider in deciding whether there was more than one conspiracy, but they're not necessarily controlling.

Similarly, just because there were different subgroups operating in different places with many different criminal acts were committed over a long period of time does not necessarily mean there was more than one conspiracy.

J.A. 3321-22.

The evidence, viewed in a light most favorable to the government, establishes an on-going conspiracy to grow and harvest marijuana for resale, in fields of corn, both in Indiana and Michigan. The evidence also is sufficient to establish: (1) the connection of the Robinson brothers, Marcus and Chad, to both growing operations; (2) the connection of Dennis Miles to the growing operation in Michigan in 1995; and, (3) the connection of Francis Hayden to the growing operation in 1996. The fact that the evidence did not connect Dennis Miles or Francis Hayden to the operation in Indiana does not necessarily establish, as a matter of fact or law, separate conspiracies. The issue was properly presented to the jury. We find no error.

## G.  Sentencing Issues

### 1.  Dennis Miles

The District Court submitted separate jury verdict forms as to each of the four appellants. As to Dennis Miles, the verdict form indicated that the jury had found Miles "guilty of conspiracy

38

to manufacture 1,000 or more marijuana plants regardless of weight or to distribute or possess with intent to distribute 1,000 or more kilograms of marijuana." J.A. 412.

In spite of that verdict, Miles extrapolates from the testimony of James Austin Mattingly and argues that the district court erred in finding the offense level for the marijuana attributed to him was sufficient to call for an offense level 32. Rather, Miles argues that the offense level should have been reduced to an offense level of 26 calling for a sentencing range of 63-78 months. The presentence report does not refer as to the specific year of the Sentencing Guidelines Manual that was used in the case of Miles whose conduct appears limited to the summer of 1995, but the Sentencing Guidelines Manual, effective November 1, 1994, is the relevant manual. That Sentencing Manual set the offense level for at least 1,000 KG but less than 3,000 KG of marijuana at 32. *See* U.S.S.G. § 2D1.1(c)(4).

On page 95 of the 1994 Guidelines Manual, the following statement sets forth the equivalency mandates as to marijuana plants:

> In cases involving fifty or more marihuana plants, an equivalency of one plant to one kilogram of marihuana is derived from the statutory penalty provisions of 21 U.S.C. § 841(b)(1)(A), (B), and (D). In cases involving fewer than fifty plants, the statute is silent as to the equivalency. . .

As a consequence of the equivalency mandates and the jury's specific finding of 1,000 or more marijuana plants, we find no error in the district court's determination that the offense level for Miles was 32. In that context, we also find that the testimony of James Austin Mattingly, viewed in a light most favorable to the government, supports the jury's finding on more than 1,000 marijuana plants as to Miles.

39

Case No. 01-2395/2398/2664/02-1450

We observe that the district court carefully explained to the jurors the issue of the weight of

the marijuana or plants attributable to each defendant in the following passage:

> In answering the question about the quantity of marijuana for which a defendant is accountable, you should include, but are not limited to, any amounts actually possessed or distributed by a defendant in connection with the conspiracy.

> You should also consider any quantities of marijuana that a defendant understood would be manufactured, possessed with intent to distribute or to distribute in the course of the conspiracy by that defendant or by another member of the conspiracy, whether or not charged.

> In determining what a defendant was prepared to do personally in terms of total drug quantities, consider that defendant's statements and actions, and the context in which that defendant spoke and acted. Including what the defendant saw and heard and what was said and done by other members of the conspiracy during the course of the conspiracy.

> In addition, in deciding whether a defendant should be held accountable for a controlled substance which that defendant did not personally manufacture, possess with intent to distribute or distribute, you should consider amounts which, as part of the conspiracy, the defendant sought to manufacture, possess, aid, abet, induce or cause another member of the conspiracy to manufacture, possess, aid or abet with intent to distribute or to distribute.

> You should also consider the amounts which any other coconspirator intended to manufacture, possess with intent to distribute or to distribute if that conspirator's intention was (a) in furtherance of the conspiracy and (b) there was reason to believe it to be foreseeable by the defendant.

> The defendant is accountable for any amount of marijuana that he was directly involved in, even if he was mistaken as to how much of the controlled substance was actually involved.

J.A. 3313-15.

The district court also provided the jury with a verdict form that enabled the jury to fix the weight of the marijuana as indicated in the Miles verdict form.[27]

We find that the district court carefully handled the issue of the number of plants and the weight of the marijuana attributable to each appellant, including Miles, and we find no error in the determination that the offense level for Miles was 32, prompting a sentence of 121 months.

### 2. Francis Hayden

The government filed a notice of sentencing enhancement due to Hayden's two prior felony drug convictions which were entered on September 26, 1980 and November 19, 1990. Both convictions relate to marijuana offenses. Hayden concedes that he has two prior felony drug convictions, but argues that both convictions should be excluded for the purpose of calculating his criminal history. Application Note 1 to U.S.S.G. § 4A1.1(a) provides that a sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's resulting incarceration extended into the fifteen-year period. Under this analysis,

---

[27] The completed verdict form as to Count I for Dennis Miles follows:

  X      Guilty of conspiracy to manufacture 1,000 or more marijuana plants regardless of weight or to distribute or possess with intent to distribute 1,000 or more kilograms of marijuana

        Guilty of conspiracy to manufacture 100 or more but less than 1,000 marijuana plants regardless of weight or to distribute or possess with intent to distribute 100 or more but less than 1,000 kilograms of marijuana

        Guilty of conspiracy to manufacture 50 or more but less than 100 marijuana plants regardless of weight or to distribute or possess with intent to distribute 50 or more but less than 100 kilograms of marijuana

        Guilty of conspiracy to manufacture less than 50 marijuana plants regardless of weight or to distribute or possess with intent to distribute less than 50 kilograms of marijuana

        Not guilty

J.A. 412.

the 1990 conviction would clearly count. The presentence report indicates that the sentence for the 1980 arrest ended in a sentence of one year and one day, but was imposed on July 30, 1984 and, thus, would also count, as Hayden's conduct clearly took place in 1996. Thus, it seems Hayden's argument is fatally flawed; but, in any event, the imposition of the life sentence in this case is statutorily driven by the provisions of 21 U.S.C. § 841 (b)(1)(A). We agree with the district court that Hayden's due process and equal protection claims, to the extent there is a factual basis for the arguments, are foreclosed by *United States v. Bredy*, 209 F.3d 1193, 1997-98 (10th Cir.), *cert. denied*, 531 U.S. 897 (2000).

We find no error in the Hayden sentence.

## IV. Conclusion.

After a careful review, we find no error that would justify setting aside either the convictions or sentences of the four defendants.

**AFFIRMED.**